ROSEANN C. O'CONNOR *v.* BRIAN O'CONNOR
(12770)

PETERS, C. J., SHEA, DANNEHY, CALLAHAN and M. HENNESSEY, Js.

Argued October 8—decision released December 23, 1986

*Kathryn Calibey,* with whom, on the brief, was *John J. Houlihan, Jr.,* for the appellant (plaintiff).

*James O'Connor Shea,* with whom was *Roger L. Brewer,* for the appellee (defendant).

PETERS, C. J. The sole issue on this appeal is whether, under the circumstances of this case, an injured person may pursue a cause of action under Connecticut law to recover for allegedly tortious conduct that occurred in a jurisdiction where such a cause of action would not be permitted. The plaintiff, Roseann O'Connor, brought an action against the defendant, Brian O'Connor, seeking damages for injuries that she suffered as a result of an automobile accident in Quebec.[1] The trial court, *Reilly, J.,* granted the defendant's motion to strike the complaint, finding that the law of

---

[1] The parties were not related at the time of the accident. They subsequently married each other.

Quebec, the place of injury, governed the controversy and that Quebec law precluded the plaintiff's action. Thereafter, the court, *S. Freedman, J.,* rendered a judgment in favor of the defendant. The plaintiff appealed to the Appellate Court, which, in a per curiam opinion, upheld the trial court's judgment. We reverse the judgment of the Appellate Court.

The relevant facts are undisputed. The plaintiff was injured as a result of a one car automobile accident that occurred on September 3, 1981, in the province of Quebec, Canada. At the time of the accident, the defendant was operating the automobile and the plaintiff was his sole passenger. The parties, both of whom were Connecticut domiciliaries, were on a one day pleasure trip that began, and was intended to end, in Vermont. The plaintiff underwent hospital treatment for her injuries in Quebec and has suffered continuing physical disabilities while residing in Connecticut.

The plaintiff brought an action against the defendant on August 17, 1983, alleging that she had suffered serious and permanent injuries as a result of the defendant's negligent operation of the automobile. The plaintiff's complaint stated a cause of action permitted by General Statutes § 38-323,[2] part of Connecticut's No-

[2] "[General Statutes] Sec. 38-323. CAUSE OF ACTION ALLOWABLE, WHEN. (a) No cause of action to recover economic loss or noneconomic detriment based on negligence arising out of the ownership, maintenance or use of a private passenger motor vehicle may be maintained against an owner, registrant, operator or occupant of a private passenger motor vehicle with respect to which security has been provided as required by this chapter, or against any person or organization legally responsible for his acts or omissions, unless the injured party has sustained (1) death, (2) permanent injury, (3) fracture of any bone, (4) permanent significant disfigurement, (5) permanent loss of any bodily function, (6) loss of a body member or (7) allowable expense as defined in section 38-319 in excess of four hundred dollars. Any person who receives free medical, hospitalization and surgical care shall be deemed to meet the requirements of subdivision (7) if the reasonable value of such care exceeds four hundred dollars.

fault Motor Vehicle Insurance Act, General Statutes §§ 38-319 through 38-350. Section 38-323 permits the victim of serious physical or economic injury caused by an automobile accident to sue the tortfeasor for damages. The defendant, however, moved to strike the complaint, on the ground that the applicable law in the case was the law of Quebec. Quebec law would not permit the plaintiff's tort action because Quebec Revised Statutes, chapter A-25, title II, §§ 3 and 4, provides instead for government funded compensation for victims of bodily injury caused by automobile accidents.[3]

After a hearing, the trial court, *Reilly, J.,* granted the motion to strike in an oral decision. The court expressly based its decision on this court's opinion in *Gibson* v. *Fullin,* 172 Conn. 407, 374 A.2d 1061 (1977), our most recent decision affirming the doctrine that

"(b) The exemption under subsection (a) of a person from liability to pay damages for injury applies only with respect to injury to (1) owners of private passenger motor vehicles with respect to which security is required under this chapter, (2) persons entitled to basic reparations benefits from any such owner or his insurer or through the assigned claims plan, and (3) persons who would be entitled to such benefits but for section 38-331 or 38-332."

[3] Quebec Revised Statutes, chapter A-25, title II, provides in relevant part: "3. The victim of bodily injury caused by an automobile shall be compensated by the Régie in accordance with this title, regardless of who is at fault.

"4. The indemnities provided for in this title are in the place and stead of all rights, recourses and rights of action of any one by reason of bodily injury caused by an automobile and no action in that respect shall be admitted before any court of justice.

"Subject to section 18, where bodily injury was caused by an automobile, the pecuniary compensations or benefits provided for the compensation of such injury by the Workmen's Compensation Act (chapter A-3) or by the Crime Victims Compensation Act (chapter I-6) are in the place and stead of all rights, recourses and rights of action of any one by reason of such bodily injury and no action in that respect shall be admitted before any court of justice.

"The preceding provisions of this section do not apply to the cases contemplated in section 17.

"Nothing in this section limits the right of a victim to claim an indemnity under a private insurance scheme, regardless of who is at fault."

the nature and extent of tort liability is governed by the place of injury, hereinafter referred to as "lex loci delicti" or "lex loci." When judgment was subsequently rendered in favor of the defendant, the plaintiff appealed to the Appellate Court, which, like the trial court, considered itself bound by this court's past adherence to the lex loci doctrine. Accordingly, the Appellate Court, in a per curiam opinion, affirmed the judgment of the trial court. *O'Connor* v. *O'Connor*, 4 Conn. App. 19, 20, 492 A.2d 207, cert. granted, 196 Conn. 812, 495 A.2d 280 (1985).

On appeal to this court, the plaintiff argues that the trial court erred in granting the defendant's motion to strike. Recognizing that the trial court and the Appellate Court accurately applied the rules governing conflict of laws that our Connecticut cases have previously articulated, the plaintiff urges this court to reexamine the propriety of our continued adherence to the doctrine of lex loci delicti in cases of personal injury. In the particular circumstances of this case, the plaintiff maintains, we should no longer adhere rigidly to the doctrine of lex loci but should instead seek to discern and to apply the law of the jurisdiction that has the most significant relationship to the controversy, in accordance with the principles of the Restatement Second of Conflict of Laws. Under the Restatement, according to the plaintiff, the jurisdiction that has the most significant relationship to this tort action is not Quebec but Connecticut. Quebec, although it was the place of injury, has no significant interest in applying its statutory compensation scheme to the controversy because the location of the automobile accident in Quebec was purely fortuitous. Connecticut, by contrast, has a substantial interest in applying its law to the case because: (1) both parties are domiciled and employed in Connecticut; (2) both parties are subject to the requirements and entitled to the benefits of Connecticut's no-fault

insurance law, and that law embodies a policy of providing access to the courts for persons with serious bodily injuries; and (3) aside from her initial treatment after the accident, the plaintiff has received all of her post-accident medical care in Connecticut. We agree with the plaintiff.

I

This court has traditionally adhered to the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury, or lex loci delicti. *Gibson* v. *Fullin,* supra, 411; *Menczer* v. *Menczer,* 160 Conn. 563, 564–65, 280 A.2d 875 (1971); *Landers* v. *Landers,* 153 Conn. 303, 304, 216 A.2d 183 (1966); *Orr* v. *Ahern,* 107 Conn. 174, 176, 139 A. 691 (1928). Recently, however, we have recognized that there are circumstances in which strict application of the lex loci delicti rule frustrates the legitimate expectations of the parties and undermines an important policy of this state. In such circumstances, we have refused to apply the doctrine. *Simaitis* v. *Flood,* 182 Conn. 24, 437 A.2d 828 (1980).

*Simaitis* was a plaintiff's appeal of an adverse summary judgment in a negligence action arising out of an automobile accident that occurred in Tennessee. The parties were Connecticut domiciliaries employed by a Connecticut corporation. The accident occurred while they were traveling in the course of their employment. The dispositive issue on appeal was whether the governing law was the workers' compensation act of Tennessee, which barred the plaintiff's action for damages, or the Connecticut act, which permitted such an action. We held that application of the lex loci rule in these circumstances afforded an "unsatisfactory resolution" to the choice of law problem; id., 29; noting that to employ the rule "would bestow upon temporary visitors injured in Connecticut all the relief which the Con-

necticut compensation act affords, but deny that same relief to Connecticut residents injured while on temporary business outside the state, even when all other incidents of employment . . . are in Connecticut." Id., 29–30. Although we expressly declined to reconsider the rule of lex loci for tort law in general, we decided that it was appropriate to pursue an alternate approach for choice of law issues in workers' compensation cases. The alternate approach that we adopted looked to an examination of the respective interests of the relevant jurisdictions in applying their law to the controversy, and turned for guidance to the principles of § 181 of the Restatement Second of Conflict of Laws. *Simaitis* v. *Flood*, supra, 32–33. Applying the principles of the Restatement, we held that the law of Connecticut, and not that of Tennessee, should govern the plaintiff's right to recover. Id., 34.

Our decision in *Simaitis* has rightly been interpreted as a signal that we are not wholeheartedly committed to application of lex loci as the sole approach to choice of law in all torts cases. See R. Silver & S. Twardy, "The Connecticut Torts Conflict of Laws Rule: A Proposal for Change," 57 Conn. B.J. 236, 237–38 (1983). Similarly, two federal district court cases have interpreted dicta in *Gibson* v. *Fullin*, supra, as contemplating circumstances in which Connecticut courts might deviate from the lex loci doctrine provided a "compelling reason" exists to do so. *Halstead* v. *United States*, 535 F. Sup. 782, 788 (D. Conn. 1982), aff'd sub nom. *Saloomey* v. *Jeppesen & Co.*, 707 F.2d 671 (2d Cir. 1983); *DeForneaux* v. *Sturm, Ruger & Co.*, 503 F. Sup. 2, 4 (D. Conn.), aff'd, 639 F.2d 768 (2d Cir. 1980), cert. denied, 451 U.S. 908, 101 S. Ct. 1975, 68 L. Ed. 2d 295 (1981).[4]

---

[4] The relevant dicta in *Gibson* v. *Fullin*, 172 Conn. 407, 411, 374 A.2d 1061 (1977), notes that "there has been some tendency recently to depart" from lex loci delicti in modern jurisprudence, citing, among other sources,

## II

We have consistently held that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic requires it." *Herald Publishing Co.* v. *Bill,* 142 Conn. 53, 62, 111 A.2d 4 (1955); see also *State* v. *Castonguay,* 194 Conn. 416, 435, 481 A.2d 56 (1984); *Society for Savings* v. *Chestnut Estates, Inc.,* 176 Conn. 563, 570, 409 A.2d 1020 (1979). We have also recognized, however, that "[p]rinciples of law which serve one generation well may, by reason of changing conditions, disserve a later one," and that "[e]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." *Herald Publishing Co.* v. *Bill,* supra. Accordingly, we now undertake to analyze the policies and principles underlying the doctrine of lex loci delicti, as a preliminary step to determining whether "cogent reasons and inescapable logic" demand that we abandon the doctrine under the circumstances of the present case.

The doctrine of lex loci delicti, as first adopted by American courts in the late nineteenth and early twentieth centuries, presumes that the rights and obligations of the parties to a tort action "vest" at the place of injury. See 3 J. Beale, Conflict of Laws (1935) p. 1968. Justice Cardozo, describing the vested rights theory in *Loucks* v. *Standard Oil Co.,* 224 N.Y. 99, 110, 120 N.E. 198 (1918), stated: "A foreign statute is not law in this state, but it gives rise to an obligation, which, if transitory, 'follows the person and may be enforced wherever the person may be found . . . . [I]t is a principle of every civilized law that vested rights shall be

the Restatement Second of Conflict of Laws. The opinion continues: "Under this newer approach, the developing rule is still very much in a transitional stage, and *the present case presents no compelling reason to abandon the traditional rule.*" (Emphasis added.) *Gibson* v. *Fullin,* supra.

protected' (Beale, [Conflict of Laws], § 51)." In one of the earliest Connecticut decisions to recognize the lex loci doctrine, this court held: "The right of action for the injury is inseparable from its extent, hence the measure of damages as well as the right of recovery are determined by the place of the injury . . . . Such an obligation, or right of action, as a general rule, becomes vested, and will be enforced here precisely as if the obligation or right of action had accrued or arisen in this jurisdiction." *Commonwealth Fuel Co.* v. *McNeil,* 103 Conn. 390, 405–406, 130 A. 794 (1925). The vested rights theory was a guiding principle of the first Restatement of Conflict of Laws. See Restatement, Conflict of Laws (1934) §§ 377 through 379.

The vested rights theory of choice of law is an anachronism in modern jurisprudence. Its underlying premise, that the legislative jurisdiction of the place where a right "vests" must be recognized in every other jurisdiction, presupposes that a nationally uniform system of choice of law rules is necessary and desirable. See R. Leflar, American Conflicts Law (1968) pp. 205–206. Choice of law rules are not immutable principles, however. Subject to the limitations of the due process clause of the fourteenth amendment[5] and the full faith and credit clause of article IV, § 1, of the United States constitution;[6] see *Phillips Petroleum Co.* v. *Shutts,* 472 U.S. 797, 814–23, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985); *Allstate Ins. Co.* v. *Hague,* 449 U.S. 302, 308–13, 101 S. Ct. 633, 66 L. Ed. 2d 521, reh. denied, 450 U.S.

[5] Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[6] The United States constitution, article IV, § 1, provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

971, 101 S. Ct. 1494, 67 L. Ed. 2d 623 (1981); *Alaska Packers Assn.* v. *Industrial Accident Commission,* 294 U.S. 532, 541–42, 547, 55 S. Ct. 518, 79 L. Ed. 1044 (1935); individual state courts are free to formulate choice of law rules as they deem appropriate. "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co.* v. *Hague,* supra, 312–13; see generally J. Martin, "Personal Jurisdiction and Choice of Law," 78 Mich. L. Rev. 872, 874 (1980); R. Leflar, supra.

Stripped of the mantle of constitutional authority, the vested rights doctrine is simply another legal theory, and one which has been the subject of extensive criticism for the past half century. See W. Cook, "The Logical and Legal Bases of the Conflict of Laws," 33 Yale L.J. 457 (1924); E. Lorenzen, "Territoriality, Public Policy and the Conflict of Laws," 33 Yale L.J. 736 (1924); H. Yntema, "The Hornbook Method and the Conflict of Laws," 37 Yale L.J. 468 (1928). Professor David F. Cavers criticized the vested rights doctrine as ignoring the substantive content of legal rules and focusing exclusively on territorial concerns, "the law's content being irrelevant to the choice" of law. D. Cavers, Re-Stating the Conflict of Laws: The Chapter on Contracts, *in* XXth Century Comparative and Conflicts Law (1961) pp. 349, 350. Another, more fundamental criticism of the vested rights theory of conflicts of law is that it fails to explain "why the law of the place of wrong should be applied to cases which have arisen there. [It gives] us a guiding principle but without any *raison d'etre.*" M. Hancock, Torts in the Conflict of Laws (1942) p. 36.

The theoretical barrenness of the vested rights doctrine, from which the rule of lex loci delicti derives, is

but one of the many reasons that a majority of state courts have rejected the rule of lex loci,[7] and that legal scholars have virtually unanimously urged its abandonment.[8] "The basic theme running through the attacks on the place of injury rule is that wooden application of a few overly simple rules, based on the outmoded 'vested rights theory,' cannot solve the complex problems which arise in modern litigation and may often yield harsh, unnecessary and unjust results." *Griffith* v. *United Air Lines, Inc.,* 416 Pa. 1, 13, 203 A.2d 796 (1964). The lex loci approach fails to acknowledge that jurisdictions other than the place of injury may have a legitimate interest in applying their laws to resolve particular issues arising out of a tort controversy. See, e.g., *Babcock* v. *Jackson,* 12 N.Y.2d 473, 478, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963); *Griffith* v. *United Air Lines, Inc.,* supra; see also *Simaitis* v. *Flood,* supra, 29–30.

---

[7] Thirty-one states have rejected the lex loci doctrine in favor of policy-based approaches to choice of law. Only sixteen states, including Connecticut, continue to adhere to the doctrine. H. Kay, "Theory into Practice: Choice of Law in the Courts," 34 Mercer L. Rev. 521, 582 (1983). For a still current listing showing each state's preferred choice of law approach (excluding those which have not manifested such an approach), see id., 591–92.

[8] For a sampling of the scholarly criticism, see, e.g., D. Cavers, "A Critique of the Choice-of-Law Problem," 47 Harv. L. Rev. 173 (1933); E. Cheatham, "American Theories of Conflict of Laws: Their Role and Utility," 58 Harv. L. Rev. 361 (1945); E. Cheatham & W. Reese, "Choice of the Applicable Law," 52 Colum. L. Rev. 959 (1952); W. Cook, "Tort Liability and the Conflict of Laws," 35 Colum. L. Rev. 202 (1935); B. Currie, "Conflict, Crisis and Confusion in New York," 1963 Duke L.J. 1; A. Ehrenzweig, "The Lex Fori-Basic Rule in the Conflict of Laws," 58 Mich. L. Rev. 637 (1960); F. Harper, "Policy Bases of the Conflict of Laws: Reflections on Rereading Professor Lorenzen's Essays," 56 Yale L.J. 1155 (1947); R. Leflar, "Choice-Influencing Considerations in Conflicts Law," 41 N.Y.U. L. Rev. 267 (1966); E. Lorenzen, "Territoriality, Public Policy and the Conflict of Laws," 33 Yale L.J. 736 (1924); W. Reese, "Choice of Law: Rules or Approach," 57 Cornell L. Rev. 315 (1972); M. Rheinstein, "The Place of Wrong: A Study in the Method of Case Law," 19 Tul. L. Rev. 4 (1944); G. Stumberg, " 'The Place of the Wrong' Torts and the Conflict of Laws," 34 Wash. L. Rev. 388 (1959); R. Traynor, "Is This Conflict Really Necessary?" 37 Tex. L. Rev. 655 (1959); H. Yntema, "The Hornbook Method and the Conflict of Laws," 37 Yale L.J. 468 (1928).

Having noted the perceived weaknesses of a categorical lex loci delicti rule, we now consider the principal reasons advanced for its retention. These are: (1) the desirability of allowing the legislature to alter established choice of law doctrines; (2) stare decisis; (3) the certainty and predictability of result afforded by a categorical choice of law rule and the concomitant ease of applying such a rule; and (4) the prevention of parochial applications of forum law in controversies involving foreign jurisdictions. See generally *Friday* v. *Smoot,* 58 Del. 488, 211 A.2d 594 (1965); *McDaniel* v. *Sinn,* 194 Kan. 625, 400 P.2d 1018 (1965); *White* v. *King,* 244 Md. 348, 223 A.2d 763 (1966); see also comment, "Selection of Law Governing Measure of Damages for Wrongful Death," 61 Colum. L. Rev. 1497, 1509–10 (1961). We will examine each of these rationales in turn as they relate to the circumstances of the present case.

Because choice of law is a matter of "broad public policy," the defendant argues that it is the province of the legislature, and not the courts, to make doctrinal changes in established law. Some of the courts that have chosen to adhere to the lex loci doctrine have expressed similar sentiments. See *Friday* v. *Smoot,* supra, 493; *White* v. *King,* supra, 355. We disagree. The lex loci doctrine is the creation of jurists and scholars, not legislators. See generally M. Hancock, supra, pp. 30–36 (1942); 3 J. Beale, Conflict of Laws (1935) p. 1968; see also *Gutierrez* v. *Collins,* 583 S.W.2d 312, 315 (Tex. 1979). Statutes deal expressly with choice of law issues only rarely and episodically. See R. Traynor, "Is This Conflict Really Necessary?" 37 Tex. L. Rev. 655, 673 (1959). The defendant's reliance, in this regard, on General Statutes § 52-572d[9] is misplaced.

---

[9] "[General Statutes] Sec. 52-572d. INTERSPOUSAL IMMUNITY ABROGATED IN MOTOR VEHICLE NEGLIGENCE ACTIONS ACCRUING OUT OF STATE. In all actions brought by one resident spouse against the other resident spouse for negligence in the operation of a motor vehicle resulting in personal injury,

That statute *abolishes* the rule of lex loci delicti in actions for injuries caused by motor vehicle accidents occurring in jurisdictions which recognize interspousal immunity. The fact that, in § 52-572d, the legislature overruled a line of our decisions holding that the availability of the interspousal immunity defense depends on the law of the place of injury; see, e.g., *Landers* v. *Landers,* 153 Conn. 303, 304, 216 A.2d 183 (1966); hardly advances the defendant's argument that the legislature has implicitly *approved* of the lex loci doctrine. The legislature of course retains plenary authority, subject to constitutional mandates, to formulate statutory choice of law rules. Until the legislature chooses to act, however, this court has an independent responsibility to modernize rules of law that have traditionally reposed with the judiciary.

Regarding stare decisis, the second argument in favor of retaining lex loci, we have already noted that, while courts should not overrule established precedent except in compelling circumstances, the force of precedent will not hinder our rejection of a rule whose application no longer serves the ends of justice. *Herald Publishing Co.* v. *Bill,* 142 Conn. 53, 62, 111 A.2d 4 (1955). The arguments for adherence to precedent are least compelling, furthermore, "when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years." *Hopson* v. *St. Mary's Hospital,* 176 Conn. 485, 496 n.5, 408 A.2d 260 (1979), quoting B. Cardozo, The Nature of

wrongful death or injury to property, it shall not be a defense or a bar to the cause of action that such an action by one spouse against another would not lie in the state where the injury or death occurred. The rights of such spouses, including the standard of care to be applied in such action, shall be determined as if the injury or death had occurred in this state."

the Judicial Process (1901) p. 151. In the present case, as in most unintentional tort cases, there is no reason to suppose that the defendant planned his conduct with the intention of availing himself of the benefits of Quebec law. "Rarely do parties contemplate the consequences of tortious conduct, and rarely if at all will they give thought to the question of what law would be applied to govern their conduct if it were to result in injury." W. Reese, "Conflict of Laws and the Restatement Second," 28 Law & Contemp. Prob. 679, 699 (1963); accord *Griffith* v. *United Air Lines, Inc.,* supra, 23–24; *Wilcox* v. *Wilcox,* 26 Wis. 2d 617, 622, 133 N.W.2d 408 (1965); R. Sedler, "The Governmental Interest Approach to Choice of Law: An Analysis and a Reformulation," 25 U.C.L.A. L. Rev. 181, 230 (1977). Our refusal to adhere to lex loci delicti in this case, therefore, does not defeat any legitimate prelitigation expectations of the parties founded in reliance on our prior decisions. See *Hopson* v. *St. Mary's Hospital,* supra, 495–96.

The third argument in favor of retention of the doctrine of lex loci is that it imparts certainty, predictability, and ease of application to choice of law rules. We do not underestimate these characteristics. "Simplicity in law is a virtue. Judicial efficiency often depends upon it." R. Leflar, "Choice-Influencing Considerations in Conflicts Law," 41 N.Y.U. L. Rev. 267, 288 (1966). The virtue of simplicity must, however, be balanced against the vice of arbitrary and inflexible application of a rigid rule. "Ease of determining applicable law and uniformity of rules of decision . . . must be subordinated to the objective of proper choice of law in conflict cases, i.e., to determine the law that most appropriately applies to the issue involved . . . ." (Citations omitted.) *Reich* v. *Purcell,* 67 Cal. 2d 551, 555, 432 P.2d 727, 63 Cal. Rptr. 31 (1967). In the present case, application of the lex loci delicti doctrine

makes determination of the governing law turn upon a purely fortuitous circumstance: the geographical location of the parties' automobile at the time the accident occurred. Choice of law must not be rendered a matter of happenstance, in which the respective interests of the parties and the concerned jurisdictions receive only coincidental consideration. Numerous jurisdictions have declined to apply the law of the place of injury in similar circumstances. See *Fabricius* v. *Horgen,* 257 Iowa 268, 132 N.W.2d 410 (1965); *Thomas* v. *Hanmer,* 109 App. Div. 2d 80, 489 N.Y.S.2d 802 (1985); *Wilcox* v. *Wilcox,* supra. Applying the same rationale, the United States District Court for the District of Connecticut has refused to adhere to the lex loci doctrine in a case where the plaintiffs, Connecticut residents, were killed in an airplane crash in West Virginia. "In the absence of any meaningful contact between the litigation and the state of West Virginia other than, by pure fortuity, the site of the crash, it would be offensive to traditional notions of justice and normal expectations to apply West Virginia law to adjudicate plaintiffs' wrongful death claims." *Halstead* v. *United States,* 535 F. Sup. 782 (D. Conn. 1982), aff'd sub nom. *Saloomey* v. *Jeppesen & Co.,* 707 F.2d 671 (2d Cir. 1983).

We note, furthermore, that lex loci's arguable advantages of uniformity and predictability have been undermined by its widespread rejection by courts and scholars, and by judicial constructions that avoid its strict application. Lex loci "no longer affords even a semblance of the general application that was once thought to be its great virtue." *Reich* v. *Purcell,* supra, 555. Even when it was the dominant American choice of law rule, courts frequently took advantage of various "escape devices" that allowed them to pay lip service to lex loci while avoiding its strict application.

B. Currie, "Notes on Methods and Objectives in the Conflict of Laws," 1959 Duke L.J. 171, 175–78. Such devices included characterizing the issue at stake as procedural, rather than substantive, so that the law of the forum could be applied; see *Grant* v. *McAuliffe*, 41 Cal. 2d 859, 866, 264 P.2d 944 (1953); *Kilberg* v. *Northeast Airlines*, 9 N.Y.2d 34, 41–42, 172 N.E.2d 526, 211 N.Y.S.2d 133 (1961); or characterizing a complaint framed in tort as a contract matter, thus allowing the law governing the place of contracting, rather than the place of injury, to control. See *Levy* v. *Daniels' U-Drive Auto Renting Co.*, 108 Conn. 333, 337–38, 143 A. 163 (1928); see also *Simaitis* v. *Flood,* supra, 34. Because the use of such evasive devices undermines the predictability and ease of application of the lex loci doctrine, their use has been widely disparaged by scholarly commentators. "[I]t is a poor defense of the system to say that the unacceptable results which [lex loci] will inevitably produce can be averted by disingenuousness if the courts are sufficiently alert." B. Currie, supra, 176.

We now consider the fourth principal argument in favor of retention of lex loci, that application of the doctrine prevents forum courts from exercising parochial favoritism. Without lex loci, there is a risk that the forum will not take seriously the foreign jurisdiction's legitimate interest in the controversy. See generally comment, "Selection of Law Governing Measure of Damages for Wrongful Death," supra, 1509. How seriously this risk is viewed depends upon an assessment of the available alternatives. "The alternative to a hard and fast system of doctrinal formulae is not anarchy. The difference is not between a system and no system, but between two systems; between a system which purports to have, but lacks, complete logical symmetry and one which affords latitude for the interplay and clash of conflicting factors." F. Harper, "Policy Bases of the

Conflict of Laws: Reflections on Rereading Professor Lorenzen's Essays," 56 Yale L.J. 1155, 1157–58 (1947). Existing case law in other jurisdictions demonstrates that conflicts principles need not depend solely upon lex loci to assure proper deference to the legitimate claims of foreign law. A principled search for the local law of the state with the most significant relationship to the occurrence and the parties will often cause foreign law to be recognized as the law that should govern the controversy. See, e.g., *Neumeier* v. *Kuehner*, 31 N.Y.2d 121, 125–30, 286 N.E.2d 454, 335 N.Y.S.2d 64 (1972); *Dym* v. *Gordon*, 16 N.Y.2d 120, 125–28, 209 N.E.2d 792, 262 N.Y.S.2d 463 (1965); *Casey* v. *Manson Construction & Engineering Co.*, 247 Or. 274, 288–93, 428 P.2d 898 (1967). "There is no reason why [a judge] should be less dispassionate in a conflicts case than in any other." R. Traynor, supra, 675.

We are, therefore, persuaded that the time has come for the law in this state to abandon categorical allegiance to the doctrine of lex loci delicti in tort actions. Lex loci has lost its theoretical underpinnings. Its formerly broad base of support has suffered erosion. We need not decide today, however, whether to discard lex loci in all of its manifestations. It is sufficient for us to consider whether, in the circumstances of the present case, reason and justice require the relaxation of its stringent insistence on determining conflicts of laws solely by reference to the place where a tort occurred.

In deciding how to assess a replacement for lex loci, we recognize that the legal literature offers us various alternative approaches to the problems of choice of law. Three such approaches have gained widespread judicial acceptance: (1) the choice of law rules promulgated in the Restatement Second of Conflict of Laws; (2) the "governmental interest" approach developed

by Professor Brainerd Currie;[10] and (3) Professor Robert A. Leflar's theory of choice of law, in which the applicable law in multijurisdictional controversies is determined by reference to five "choice-influencing considerations."[11] The Restatement Second approach, the product of more than a decade of research, incorporates some of the attributes of the latter two approaches, as well as others, in an attempt to "provide formulations that were true to the cases, were broad enough to permit further development in the law, and yet were able to give some guidance by pointing to what was thought would probably be the result reached in the majority of cases." W. Reese, "The Second Restatement of Conflict of Laws Revisited," 34 Mercer L. Rev. 501, 519 (1983). A majority of the courts that have abandoned lex loci have adopted the principles of the Restatement Second as representing the most comprehensive and equitably balanced approach to conflict of laws.[12] It is

[10] The governmental interest approach prefers application of the law of the forum unless the forum state has no legitimate governmental interest in applying its law to the controversy. Determining the presence of a governmental interest requires an analysis of the policies underlying the applicable rules of decision, and an appraisal of the need for furtherance of those policies by application of forum law to the issue at stake. Only if the forum state is determined to have no interest in applying its law to the issue, and a foreign jurisdiction, by contrast, is determined to have an interest, need the court apply foreign law. If only one state has an interest in applying its law to the issue, a "false conflict" exists and the court should apply the law of the only interested state. See B. Currie, "Conflict, Crisis and Confusion in New York," 1963 Duke L.J. 1, 38–44; B. Currie, "Notes on Methods and Objectives in the Conflict of Laws," 1959 Duke L.J. 171, 178.

[11] Leflar lists his choice-influencing considerations as follows: "A. Predictability of results; B. Maintenance of interstate and international order; C. Simplification of the judicial task; D. Advancement of the forum's governmental interests; E. Application of the better rule of law." R. Leflar, "Choice-Influencing Considerations in Conflicts of Law," 41 N.Y.U. L. Rev. 267 (1966). With the exception of consideration E, the relevant factors in Leflar's methodology are similar to those employed in the Restatement Second of Conflicts of Laws; see part III of this opinion, infra.

[12] Fourteen states have expressly adopted the Restatement Second approach. See *Schwartz* v. *Schwartz,* 103 Ariz. 562, 447 P.2d 254 (1968);

therefore our conclusion that we too should incorporate the guidelines of the Restatement as the governing principles for those cases in which application of the doctrine of lex loci would produce an arbitrary, irrational result.

### III

We turn now to an examination of the relevant provisions of the Restatement Second of Conflict of Laws in the context of the dispute presently before us. We note that the defendant, if he cannot persuade us to retain the doctrine of lex loci in its entirety, argues, in the alternative, that application of the principles of the Restatement would likewise require deference to the law of Quebec in the circumstances of this case. Careful analysis of the relevant Restatement provisions persuades us of the merits of the opposite conclusion.

Section 145 of the Restatement Second provides in subsection (1) that "[t]he rights and liabilities of the parties with respect to an issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Sec-

*First National Bank* v. *Rostek,* 182 Colo. 437, 514 P.2d 314 (1973); *Bishop* v. *Florida Specialty Paint Co.,* 389 So. 2d 999 (Fla. 1980); *Rungee* v. *Allied Van Lines, Inc.,* 92 Idaho 718, 449 P.2d 378 (1968); *Ingersoll* v. *Klein,* 46 Ill. 2d 42, 262 N.E.2d 593 (1970); *Fabricius* v. *Horgen,* 257 Iowa 268, 132 N.W.2d 410 (1965); *Adams* v. *Buffalo Forge Co.,* 443 A.2d 932 (Me. 1982); *Mitchell* v. *Craft,* 211 So. 2d 509 (Miss. 1968); *Kennedy* v. *Dixon,* 439 S.W.2d 173 (Mo. 1969); *Brickner* v. *Gooden,* 525 P.2d 632 (Okla. 1974); *Casey* v. *Manson Construction & Engineering Co.,* 247 Or. 274, 428 P.2d 898 (1967); *Gutierrez* v. *Collins,* 583 S.W.2d 312 (Tex. 1979); *Pioneer Credit Corporation* v. *Carden,* 127 Vt. 229, 245 A.2d 891 (1968); *Baffin Land Corporation* v. *Monticello Motor Inn, Inc.,* 70 Wash. 2d 893, 425 P.2d 623 (1967).

In addition, the New York approach to choice of law, which evaluates and balances the contacts of jurisdictions involved in a choice of law controversy in order to apply the law of the jurisdiction that is the "center of gravity" of the controversy; see *Babcock* v. *Jackson,* 12 N.Y.2d 473, 479, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963); is commonly viewed as having merged with the Restatement Second approach. H. Kay, "Theory into Practice: Choice of Law in the Courts," 34 Mercer L. Rev. 521, 526–27 (1983).

tion 6 of the Restatement, in turn, provides: "(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law. (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protections of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

Applying the choice of law analysis of §§ 145 and 6 to the facts of this case involves a weighing of the relative significance of the various factors that § 6 lists. Of greatest importance for present purposes are the choices of policy emphasized in § 6 (2) (b), (c) and (e). We are not today concerned with a case that offends systemic policy concerns of another state or country, nor do the facts warrant an inference of justified expectations concerning the applicability of anything other than the law of the forum.[13] Although the principles of certainty and ease of application must be taken into account, the Restatement cautions against attaching independent weight to these auxiliary factors, noting that they are ancillary to the goal of providing rational, fair choice of law rules. As comment i to § 6 states: "In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules." See also Restatement (Second), Conflict of Laws § 6, comment j (policy in § 6 [2] [g] should "not

---

[13] See part II of this opinion, supra, for our discussion of the irrelevance of predictability concerns in the circumstances of this case.

be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results").

For assistance in our evaluation of the policy choices set out in §§ 145 (1) and 6 (2), we turn next to § 145 (2) of the Restatement, which establishes black-letter rules of priority to facilitate the application of the principles of § 6 to tort cases. See H. Kay, "Theory into Practice: Choice of Law in the Courts," 34 Mercer L. Rev. 521, 555 (1983). Section 145 (2) provides: "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue."

In the circumstances of the present case, because the plaintiff was injured in Quebec and the tortious conduct occurred there, § 145 (2) (a) and (b) weigh in favor of applying Quebec law.[14] Because both parties are Connecticut domiciliaries and their relationship is centered here, § 145 (2) (c) and (d) indicate that Connecticut law should be applied. To resolve this potential standoff, we need to recall that it is the significance, and not the number, of § 145 (2) contacts that determines the outcome of the choice of law inquiry under the Restate-

---

[14] See also 1 Restatement (Second), Conflict of Laws § 146, which provides: "PERSONAL INJURIES

"In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."

ment approach. As the concluding sentence of § 145 (2) states, "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." See also *Schwartz* v. *Schwartz*, 103 Ariz. 562, 565, 447 P.2d 254 (1968); *Baffin Land Corporation* v. *Monticello Motor Inn, Inc.*, 70 Wash. 2d 893, 900, 425 P.2d 623 (1967).

In order to apply the § 6 guidelines to the circumstances of the present case, we must, therefore, turn our attention once more to the particular issue whose disparate resolution by two relevant jurisdictions gives rise to the conflict of laws. Specifically, we must analyze the respective policies and interests of Quebec, the place of injury, and Connecticut, the forum state, with respect to the issue of whether the plaintiff should be allowed to recover damages from the defendant in a private cause of action premised on the defendant's negligent operation of an automobile. In the process of that analysis, we must evaluate the relevance of each jurisdiction's § 145 (2) contacts to this particular controversy.

We first consider the policies and interests of Quebec in this regard. Quebec, as the place of injury, has an obvious interest in applying its standards of conduct to govern the liability, both civil and criminal, of persons who use its highways. See *Hauch* v. *Connor*, 295 Md. 120, 124, 453 A.2d 1207 (1983); *Fox* v. *Morrison Motor Freight, Inc.*, 25 Ohio St. 2d 193, 198, 267 N.E.2d 405 (1971); *Tower* v. *Schwabe*, 284 Or. 105, 107, 585 P.2d 662 (1978). "This interest arises from the right and duty of the sovereign to protect those within its borders from injury to person or property . . . ." Comment, "Selection of Law Governing Measure of Damages for Wrongful Death," 61 Colum. L. Rev. 1497, 1510 (1961). If the issue at stake in the present controversy were whether the defendant's conduct was negligent, we might well conclude that Quebec's inter-

est in applying its law was of paramount significance. See *Fox* v. *Morrison Motor Freight, Inc.,* supra; *Wilcox* v. *Wilcox,* 26 Wis. 2d 617, 631, 133 N.W.2d 408 (1965).

In the present case, however, the relevant Quebec law expresses no interest in regulating the conduct of the defendant, but rather limits the liability exposure to which his conduct subjects him. Quebec's Automobile Insurance Act, Quebec Revised Statutes, chapter A-25, presumably embodies policies similar to that of our own no-fault automobile insurance act: assurance to automobile accident victims of access to expeditious and adequate financial compensation, and assurance to automobile owners of access to insurance at reasonable premiums. Compare General Statutes § 38-319 et seq.; *Gentile* v. *Altermatt,* 169 Conn. 267, 289–94, 304, 363 A.2d 1 (1975), cert. denied, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see also *Thomas* v. *Hanmer,* 109 App. Div. 2d 80, 84, 489 N.Y.S.2d 802 (1985) (identifying same purposes in evaluating Quebec no-fault act with reference to New York no-fault statute). Quebec, however, has chosen to implement this policy, in title II, § 4, with a provision which, like our workers' compensation act; General Statutes § 31-275 et seq.; eschews investigation into the possible negligence of the defendant's conduct and limits the amount of damages the victim of the defendant's conduct may recover.[15] In *Reich* v. *Purcell,* 67 Cal. 2d

---

[15] We note additionally that the Quebec act does not express a policy of immunizing tortfeasors from the consequences of their actions. Quebec Revised Statutes, chapter A-25, title II, § 7, provides in relevant part: "Notwithstanding section 4, the Régie, where it compensates a victim under this section, is subrogated in the victim's rights and is entitled to recover the compensation and the capital representing the pensions that the Régie is thereby required to pay from any person not resident in Quebec who, under the law of the place where the accident occurred, is responsible, and from any person liable for compensation for bodily injury caused in the accident by such non-resident. The subrogation is effected of right by the decision of the Régie to compensate the victim."

551, 556, 432 P.2d 727, 63 Cal. Rptr. 31 (1967), Chief Justice Traynor, speaking with regard to statutory limitations on wrongful death damages, noted: "Limitations of damages . . . have little or nothing to do with conduct. They are concerned not with how people should behave but with how survivors should be compensated. The state of the place of the wrong has little or no interest in such compensation when none of the parties reside there."

The policies behind Quebec's no-fault rule would not be substantially furthered by application of Quebec law in the circumstances of the present case. In this case, neither the victim nor the tortfeasor is a Quebec resident. There is no evidence on the record that the vehicle involved in the accident was insured or registered in Quebec. Cf. *Peters* v. *Peters,* 63 Hawaii 653, 666, 634 P.2d 586 (1981) (fact that rental automobile insured in place of injury gave place of injury interest in applying its law). Rather, the record indicates that the parties were merely "passing through" the province, and that the location of the accident was fortuitous. Clearly the goal of reducing insurance premiums in Quebec is not furthered by application of the Quebec no-fault act to an accident involving only nonresidents of Quebec, in an automobile that was not insured in the province. Quebec's interest in alleviating the administrative and judicial costs of automobile accident litigation is in no way implicated when, as in this case, a nonresident brings suit against another nonresident in a foreign jurisdiction. We note that a Quebec resident suing the defendant in Connecticut would not be subject to the Quebec act's lawsuit prohibition; under the Quebec act, such a plaintiff would be entitled to statutory compensation under Quebec law as well as any damages recoverable in a private action under Connecticut law.

Quebec Revised Statutes, chapter A-25, title II, § 7.[16] Application of Quebec law in these circumstances would thus produce the same anomalous result that we deplored in *Simaitis* v. *Flood,* 182 Conn. 24, 29–30, 437 A.2d 828 (1980), since it would "bestow upon temporary visitors injured in Connecticut all the relief which [Connecticut law] affords, but deny that same relief to Connecticut residents" injured in Quebec. Id.[17]

The foregoing analysis leads us to conclude that Quebec's status as the place of injury is not a significant contact for purposes of our choice of law inquiry in this case. Accordingly, since Quebec has no other contacts with this litigation, we hold that Quebec has no interest in applying its no-fault act to bar the plaintiff's action.

In order to justify the application of Connecticut law to the issue at stake, however, we must consider whether Connecticut's contacts with the litigation give it a legitimate interest in applying its law to the controversy. We are persuaded that Connecticut does have the requisite significant contacts.[18]

---

[16] Quebec Revised Statutes, chapter A-25, title II, § 7, provides in relevant part: "The victim of an accident that occurred outside Quebec who is entitled to the compensation provided for in this title may benefit by it while retaining his rights of action with regard to the excess under the law of the place where the accident occurred."

[17] It is also significant for purposes of this analysis that Quebec provides only a limited right of recovery for nonresidents injured in automobile accidents within its territorial boundaries. Such nonresidents are entitled to compensation only to the extent that they are not responsible for the accident, "unless otherwise agreed between the Régie and the competent authorities of the place of residence of such victim." Quebec Revised Statutes, chapter A-25, title II, § 8.

[18] Notwithstanding our conclusion that Connecticut is the only jurisdiction with a significant interest in applying its law to the present controversy, we decline to adopt the plaintiff's characterization of this case as a "false conflict." The plaintiff's interpretation of a false conflict, as one where the laws of two jurisdictions with contacts to the litigation differ, but only one has an interest in applying its law to the controversy, is commonly associated with the Currie govermental interest analysis approach

Connecticut has a significant interest in this litigation because both the plaintiff and the defendant are, and were at the time of the accident, Connecticut domiciliaries. Consequently, to the extent that they might have anticipated being involved in an automobile accident, they could reasonably have expected to be subject to the provisions of Connecticut's no-fault act. More importantly, however, Connecticut has a strong interest in assuring that the plaintiff may avail herself of the full scope of remedies for tortious conduct that Connecticut law affords. See *Mitchell* v. *Craft*, 211 So. 2d 509, 514 (Miss. 1968); *Thomas* v. *Hanmer*, supra, 84. Connecticut's no-fault act serves similar purposes to Quebec's Automobile Insurance Act; *Gentile* v. *Altermatt*, supra; with one important exception: unlike the Quebec act, the Connecticut act embraces the policy of "providing the more seriously injured the opportunity to seek true redress" in a judicial forum. *Gentile* v. *Altermatt*, supra, 297. To deny the plaintiff a cause of action in this case would frustrate this important purpose of the Connecticut no-fault statute. This is particularly true when, as in this case, the alleged consequences of the plaintiff's injury, including medical expenses and lost income, have been borne in Connecticut.

Our conclusion that we should look to the law of Connecticut rather than to the law of Quebec in this case should not be construed as a blanket endorsement of reliance on Connecticut law in all circumstances. We

to choice of law. See footnote 10, supra; see also R. Traynor, "Is This Conflict Really Necessary?" 37 Tex. L. Rev. 655 (1959). We note, however, that other commentators have declined to characterize such a situation as a false conflict, but rather have reserved that term to describe cases where application of the laws of two or more jurisidictions with contacts to the litigation reach identical results, thus eliminating any potential conflict of laws. See R. LeFlar, American Conflicts Law (1968) pp. 237–38; see generally A. Ehrenzweig, "A Counter-Revolution in Conflicts Law? From Beale to Cavers," 80 Harv. L. Rev. 377 (1966).

are persuaded that, in this case, justice and reason point to Connecticut as the jurisdiction whose laws bear the most significant relationship to the controversy at hand. We are reassured that courts in other jurisdictions, relying on the Restatement Second of Conflict of Laws, have equally concluded that they should disregard the law of a foreign jurisdiction that has at best a fortuitous and incidental relationship to the controversy to be adjudicated. See *Schwartz* v. *Schwartz,* supra; *First National Bank* v. *Rostek,* 182 Colo. 437, 514 P.2d 314 (1973); *Ingersoll* v. *Klein,* 46 Ill. 2d 42, 262 N.E.2d 593 (1970); *Fabricius* v. *Horgen,* 257 Iowa 268, 132 N.W.2d 410 (1965); *Mitchell* v. *Craft,* supra; *Kennedy* v. *Dixon,* 439 S.W.2d 173 (Mo. 1969); *Gutierrez* v. *Collins,* 583 S.W.2d 312 (Tex. 1979). We can readily conceive of circumstances, however, in which the choice between the relevant jurisdictions would be much more problematic. For example, Quebec law would have been entitled to greater weight if the accident had involved a Quebec resident; see, e.g., *Dym* v. *Gordon,* 16 N.Y.2d 120, 125, 209 N.E.2d 792, 262 N.Y.S.2d 463 (1965); or a unique configuration of Quebec roads; see, e.g., *Casey* v. *Manson Construction & Engineering Co.,* 247 Or. 274, 288, 428 P.2d 898 (1967); or if the defendant's negligent conduct, rather than the plaintiff's right to sue, had been at issue. The guiding principles of the Restatement command respect precisely because they encourage a searching case-by-case contextual inquiry into the significance of the interests that the law of competing jurisdictions may assert in particular controversies.

We therefore reverse the judgment of the Appellate Court upholding the trial court's granting of the motion to strike the plaintiff's complaint, and direct that this case be remanded to the trial court for further proceedings consistent with this opinion.

In this opinion the other justices concurred.