[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The principal issue in this case is whether or not New York Child Support Guidelines should be applied in this Connecticut dissolution action when the wife and the minor child have been New York residents for a substantial number of years. Under New York law a court can order child support and college education costs to be paid beyond age 18, even though the parties have not agreed in writing. This is a conflict of laws case as well as the CT Page 6081 first known application of Public Act 97-1.
FACTS
After hearing testimony and reviewing the exhibits, the court finds the following facts: The plaintiff husband has been a life-long resident of Connecticut. On April 13, 1991 he married DeAnn Quigley in Connecticut. A child, Mitchell James Murphy, was born, issue of the marriage, on September 13, 1992. The parties separated in September, 1995. The defendant wife then returned to her hometown of Cazenovia, New York. In late 1995 she purchased a home in Cazenovia. She has lived there with the minor child since the purchase of said home. The plaintiff has been consistently domiciled in Connecticut. Both parties are in good health and are employed full-time.
The husband is a long time employee of Westinghouse, now merged with CBS, working in a financial capacity. He has a 401K Plan and a small pension. He receives a bonus in addition to his salary. At trial, the accuracy of the tax calculations on his financial affidavit and his modified financial affidavit were in dispute. To resolve these questions, this court required the parties to prepare pro forma tax calculations. Neither party complied. The court, therefore, based on all the evidence, accepts the facts stated in the plaintiff's latest financial affidavit filed: gross income weekly, $2,043; net income weekly, $1,371.
In 1989, the plaintiff purchased a condominium at 620 Croton Drive, Croton-On-The Hudson, New York. Neither party resided in the condominum unit. The plaintiff has always received rent from the unit until 1997. The latest rent was approximately $1,000 per month. Although his financial affidavit indicates he is paying the mortgage, common charges, taxes, and other expenses to maintain the unit, he shows no rental income. This court believes that the plaintiff is willfully under earning. He has an additional earning capacity of $12,000 annually from condominum rental income Miller v. Miller, 180 Conn. 464, 471 (1983).
The defendant has been employed in her chosen profession at Cazenovia College. She pays $120 per week for day care which enables her to be employed in her home town. Her affidavit discloses income of $594 per week gross, $466 week net. From the net sum she has to pay the $120 weekly day care which is not reimbursed by her employer. CT Page 6082
The court finds that the marriage has broken down irretrievably, and a decree dissolving the marriage should enter.
DISCUSSION OF LAW
In her Claims for Relief, the defendant requests that the New York Child Support Guidelines be applied. She requests that the child support be ordered until age 21, the amount be increased to the New York Child Support Guidelines level, and the plaintiff be ordered to pay a portion of post secondary education costs even though the plaintiff and the defendant did not sign a written agreement to that effect. The court cannot find any case in Connecticut that has considered the issue. The defendant has researched the issue and candidly informs the court that there are no Connecticut or New York cases on point. She relies on the plain reading of New York Domestic Relations Laws § 240 and the trend in Connecticut to reject lex loci, and asks this court to apply the substantial relationship test. The plaintiff has offered no research and virtually no legal argument in opposition.
Section 240 of the New York Domestic Relations Law (DRL), effective January 1, 1998, covers obligations for child support: "The court shall makes its award for child support pursuant to subdivision one-b of this section". DRL § 240 1-b(b)(2) states as follows, "Child support shall mean a sum to be paid pursuant to court order or decree by either or both parents or pursuant to a valid agreement between the parties for care, maintenance, and education of any unemancapiated child under the age of twenty-one years."
The New York Child Support Guidelines definitions are contained in DLR § 240 1-b (b)(3)(4) and (5). The defendant claims that by applying these guidelines, a larger sum than that determined by the Connecticut Child Support Guidelines would be ordered. The New York Child Support Guidelines order 17% of the combined parental income or support for one child. Although Connecticut's percentage is higher, New York has a more liberal definition of combined income, different day care calculations and a variation of the non-custodial parent's support obligations. The result would appear to be a higher child support order under the New York scheme.
DRL § 240 1-b(c)(7) requires this court to consider CT Page 6083 orders of post secondary support beyond age eighteen: "Where the court determines, having regard for the circumstances of the case and of the respective parties and in the best interests of the child, and as justice requires, that the present or future provision of post-secondary, private, special, or enriched education for the child is appropriate, the court may award educational expenses. The non-custodial parent shall pay educational expenses, as awarded, in a manner determined by the court, including direct payment to the educational provider."
The defendant, in briefing these three claims, indicated that Connecticut courts should apply the "most substantial relationship test". After applying that test, the defendant asks that Connecticut declare that New York, being the child's residence for the last few years (nearly half his life), has the most substantial relationship. The remainder of this memorandum will discuss the following on the subject: O'Connor v. O'Connor,201 Conn. 632 (1986); Reichhold Chemicals v. Hartford Accident Indemnity Co., 243 Conn. 401 (1997); Elgar v. Elgar,238 Conn. 839 (1996) and Public Act 97-1, effective January 1, 1998.
Prior to 1986, virtually all conflict of laws matters were resolved by applying "lex loci". A new trend started withO'Connor v. O'Connor, 201 Conn. 632 (1986), when Connecticut abandoned lex loci delicti in tort cases. O'Connor dealt with a motor vehicle personal injury in Quebec. The plaintiff, a Connecticut domiciliary, sought damages in a Connecticut court from the defendant, also a Connecticut domiciliary. The law of Quebec precluded the plaintiff's claim. The trial court granted a Motion to Strike, concluding that the Connecticut rule of lex loci required the application of Quebec law.
On appeal to the Supreme Court, the court found that Quebec had no interest in applying its law to bar the plaintiff's action. Neither party was resident of Quebec. There was no evidence on the record that the vehicle involved in the accident was registered or insured in Canada. The Supreme Court noted that the only contact with the litigation was its status as the place of injury. The court recognized that lex loci delicti in Connecticut required, prior to 1986, that Quebec law be applied to this choice of law matter. The case was remanded to the trial court for further proceedings. "Recently, however, we have recognized that there are circumstances in which strict application of the lex loci delicti frustrates the legitimate expectations of the parties and undermines an important policy of CT Page 6084 this state. In such circumstances we have refused to apply the doctrine." Id., 637 (citing Simaitis v. Flood, 182 Conn. 24
(1980)).
The court noted that the doctrine of lex loci delicti was first adopted in American courts in the late nineteenth and early twentieth centuries and no longer is automatically applicable in many jurisdictions. Lex loci is based on a vested right analysis.O'Connor noted that the vested rights theory of choice of laws is an anachronism in modern jurisprudence. The court noted "the perceived weaknesses of a categorical lex loci delicti rule." Id., 643. The defendant in O'Connor had argued that the lex loci rule is within the province of the legislature. The Supreme Court disagreed and stated, "The lex loci doctrine is the creation of jurists and scholars, not legislators." Id., 643. "We are, therefore, persuaded that the time has come for the law in this state to abandon categorical allegiance to the doctrine of lex loci delicti in tort actions." Id., 648.
In discussing the replacement for lex loci delicti, the court examined three separate approaches that have gained widespread judicial acceptance: (1) the choice of law rules promulgated in the Restatement Second of Conflict of Laws; (2) the "governmental interest" approach developed by Professor Brainerd Currie; and (3) Professor Robert A. Leflar's theory of choice of law, in which the applicable law in multi-jurisdictional controversies is determined by reference to five "choice influencing considerations." Id., 648-49. The court noted that the Restatement Second approach was the product of more than a decade of research and incorporates some of the attributes of the other two approaches, as well as others, in an attempt to "provide formulations that were true to the cases, were broad enough to permit further development in the law, and yet were able to give some guidance by pointing to what was thought would probably be the result reached in the majority of cases." Id., 649. "It is therefore our conclusion that we too should incorporate the guidelines of the Restatement as the governing principles for those cases in which application of the doctrine of lex loci will produce an arbitrary, irrational result." Id., 649-50.
Section 145 of the Restatement Second provides in subsection (1) that "the rights and liabilities of the parties with respect to an issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in CT Page 6085 6 (Section 6 of the Restatement)." Section 6 of the Restatement provides: "(1) A court, subject to Constitutional restrictions, will follow a statutory directive of its own state on choice of law (2). When there is no such directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protections of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Id, 650-51.
Connecticut abandoned lex loci in contract cases in 1997 in a conflict of laws dispute involving environmental responsibility in a lawsuit filed against multiple insurance companies in twenty-three sites across the United States. Reichhold Chemicals.Inc. v. Hartford Accident Indemnity Co., 234 Conn. 401 (1997). The trial court instructed the jury to apply the law of New York where the insurance contract was made. A major issue in this case was whether the plaintiff had complied with the notice of occurrence provisions in the environmental insurance policies. The jury returned a verdict in favor of the defendants. The plaintiff appealed. The Supreme Court reversed and required a new trial, holding that the law of Washington, rather than New York was the appropriate law to apply as to the issue of notice compliance. The Supreme Court held that although New York had an interest in having its law applied, that interest was not sufficiently compelling to overcome the presumption in favor of the application of the state of Washington where the hazardous waste site was located. The Supreme Court abandoned the use of lex loci contractus and adopted the "most significant relationship" test set forth in Restatement (Second) of Conflict of Laws (1971 and Sup. 1988) Section 187 et seq., Id., 407.
The Supreme Court indicated that the courts generally have adopted one of three approaches to resolving choice of law issues in insurance coverage cases: (1) the "lex loci contractus" rule, (2) the "center of gravity" approach under Restatement Second or (3) the "location of the risk" approach. After discussion of all three approaches, the court held the "most significant relationship" test of Restatement Second is applicable to multi-jurisdiction insurance coverage cases. Reichhold cited O'Connor
with favor. CT Page 6086
The defendant also points to Elgar v. Elgar, 238 Conn. 839
(1996). In that case, the issue was the enforcement of an antenuptial agreement between the plaintiff and the deceased defendant. This litigation occurred in the Probate Court. In the antenuptial agreement, each party waived his or her rights in the other's property in the event of death or divorce. An attorney trial referee recommended judgment for the defendant, and the trial court rendered judgment in accordance with the report. The Supreme Court affirmed. The court held that the trial court properly upheld the choice of law provision in the antenuptial agreement specifying that it would be interpreted according to New York law. The court found that there was no evidence that this choice of law provision was obtained by fraud or undue influence. In view of the numerous contacts between the parties and New York Connecticut did not have a materially greater interest in the enforcement of the agreement than had New York. The Supreme Court based its decision on O'Connor. "We conclude, in accordance with 187 of the Restatement, that parties to a contract generally are allowed to select the law that will govern their contract, unless either: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Id., 850.
"The plaintiff was at all times a New York resident and conducted many of her affairs in New York. The decedent spent weekdays in New York and maintained a business in New York. Furthermore, the agreement was executed at the decedent's attorney' s office, which is located in New York." Id., 851. "Although there were significant contacts with Connecticut, including the facts that the marriage took place in Connecticut, that the decedent was a Connecticut resident, and that his estate is in probate in Connecticut, those contacts are not materially greater' than the contacts with New York." Id., 852. The agreement itself stated that it would be enforced in accordance with New York law. "Accordingly, we conclude that the trial court properly upheld the parties' choice of New York law." Id., 852.
The Murphys were married in Connecticut, where their child CT Page 6087 was born. The wife and the child have resided in New York since September 1995. The child's most formative years and the child's entire educational years have occurred in New York. The child is being visited by the father in New York. The father, for a while, moved to New York. The defendant was a resident of Cazenovia, New York at the time of her marriage, and the parties always contemplated returning to Cazenovia. They spent considerable time in Cazenovia during their marriage when they were residing in Connecticut. The parties agreed that the defendant would purchase a home in Cazenovia in 1995. She purchased the home. The plaintiff cooperated with that closing and provided family funds for the purchase. It was the intention of the parties to move to New York when the plaintiff was able to locate a job in the Cazenovia area. The plaintiff went on employment interviews in the Cazenovia-Utica-Syracuse area but was unable to obtain a job which provided equivalent income. The parties thereafter separated. Based upon the application of the "most significant relationship test", this court concludes that, in fact, New York has the greater contacts.
This would be the decision but for events that took place in Hartford on June 18, 1997. In the June 18th special session, the Connecticut General Assembly amended existing interstate family rules. The Uniform Interstate Family Support Act (UIFSA) was passed effective January 1, 1998. Public Act 97-1. Adoption of UIFSA "is mandated by federal law." "In order to satisfy section 454 (20(A)), on and after January 1, 1998, each State must have in effect the Uniform Interstate Family Support Act . . ." 42 U.S.C. § 466 and 666.
 UIFSA, now enacted in 48 jurisdictions, was thereafter enacted in Connecticut to replace the earlier versions of the uniform law, including the Uniform Reciprocal Enforcement of Support Act and its revisions, which made up prior Connecticut law. The act streamlines and simplifies the interstate enforcement of support orders, in particular by ensuring that only one state's order has primacy under the principle of "continuing, exclusive jurisdiction." The act also enhances the ability of persons entitled to support to use administrative, nonjudicial procedures, and to enforce current orders across state lines.
Twenty-Third Annual Report of the Connecticut Law Revision Commission, March 1998 p. 3. Connecticut's version of UIFSA differs slightly from the Uniform provisions in the area of the powers of the Family Support Magistrates and the exercise of long-arm jurisdiction in accordance with General Statutes §§ 46b-46(b) CT Page 6088 and 46b-160(d). This case appears to be the first reported or tried case in Connecticut involving UIFSA.
Under UIFSA "child means an individual, whether over or under the age of majority, who is or is alleged to be owed a duty of support by the individual' s parents or who is or is alleged to be the beneficiary of a support order directed to the parent".P.A. 97-1, Sec. 2(1). It, therefore, appears that the UIFSA permits Connecticut to order post-majority support, despite the provisions of Connecticut law, if a parent owes a duty of support beyond 18 by the application of the law of another state. General Statutes § 1-1d (Age of majority is eighteen); General Statutes § 46b-84(b) (No child support beyond eighteen generally); General Statutes § 46b-66 (Over eighteen support only by written agreement). Under Connecticut law, the Superior Court does not have subject matter jurisdiction to order post-eighteen child support unless there is a written agreement of the parties. Kennedy v. Kennedy, 177 Conn. 47, 52 (1979);Broaca v. Broaca, 181 Conn. 463, 466 (1980); General Statutes § 46b-66.
This is confirmed by UIFSA's definition of child support order. "Child support order means a support order for a child, including a child who has attained the age of majority under the law of the issuing state." P.A. 97-1, Section 2(2). "Home state means the state in which a child lived with a parent or a person acting as parent for at least six consecutive months immediately preceding the time of filing of a petition or comparable pleading for support." P.A. 97-1, Section 2(5).
This action was returnable January 14, 1997. No New York action has been commenced. This is the only action or petition for support that has been filed. The minor child's "home state" is New York. P.A. 97-1, Sec. 2(5). When Connecticut issues a support order it will become the "issuing state," which is defined as "the state in which a tribunal issues a support order or renders a judgment determining paternity." P.A. 97-Sec. 2 (10). New York cannot be the "issuing state" since no action or petition for child support has been filed in New York. P.A. 97-1, Sec. 38 states: "(a) The law of the issuing state governs the nature, extent, amount and duration of current payments and other obligations of support and the payment or arrearages under the order." UIFSA does not contain any exception to this conflict of laws rule. As a matter of fact, the enforcement of child support payments under UIFSA is governed by General Statutes § CT Page 608952-362f(n), amended by P.A. 97-1, Sec. 72(n): "The law of this state shall apply in all actions and proceedings concerning the issuance, enforcement and duration of income withholding orders issued by the Superior Court, except as provided in subsection (o) of this section."
CONCLUSION
Although the contacts with New York are significant in this case, and this court would be inclined to apply the "most substantial relationship test" in favor of New York, this case is controlled by UIFSA. P.A. 97-1, Sec. 2(2) and 2(5). Connecticut is the "issuing state" under the facts of this case. The nature, extent, amount and duration of the current payments (child support) are to be determined according to Connecticut law. The amount of child support it is to be determine by Connecticut Child Support Guidelines, not New York.
This result is buttressed by the Uniform Enforcement of Support Act. "The law of the jurisdiction which issued a support order filed with the Support Enforcement Division of the Superior Court in this state shall govern the following: (1) The interpretation of the support order entered under subsection (d) of this section, including amount, form of payment, and the duration of support." General Statutes § 52-362f (o) as amended by P.A. 97-1, Sec. 72(o). There is currently no New York support order and no pending New York petition requesting support. This court concludes that Connecticut law must be applied.
ORDER
1. The court dissolves this marriage on the grounds of irretrievable breakdown in accordance with the plaintiff's complaint dated January 14, 1997.
2. The parties are awarded the joint custody of the minor child with the defendant retaining physical custody subject to the rights of reasonable visitation in the plaintiff. The wife shall arrange for and provide the pickup for the child on one out of every four trips from Fairfield County to Cazenovia. This matter is referred to the Family Relations Office for determination of that visitation schedule.
3. The plaintiff shall pay $260 per week child support in accordance with the Connecticut Child Support Guidelines. CT Page 6090
4. The plaintiff shall pay $200 per week to the defendant as alimony, to terminate upon the plaintiff's death, the defendant's death, the defendant's remarriage or February 10, 2005, whichever event shall first occur. This order is nonmodifiable as to said date of February 10, 2005.
5. The plaintiff shall pay to the defendant as property distribution, within thirty days hereof, the sum of $6,000 cash.
6. The plaintiff shall pay to the defendant the sum of $5,000 as attorney' s fees payable at the rate of $100 per month with the first payment due thirty days from the date hereof, together with 10% interest on the unpaid amount. This order is in the nature of support.
7. The court finds that the pendente lite orders are in arrears in the amount of $1,525. The plaintiff is ordered to pay that sum to the defendant within thirty days from the date hereof.
8. The defendant shall pay the day care expenses for the minor child since that has been included within the calculations by the court to determine the $260 per week child support.
9. The plaintiff is to maintain the minor child on the current medical, dental and hospitalization insurance that he has through his place of employment and to notify and provide the defendant with copies of all documents necessary thereof. The provisions of General Statutes § 46b-84(d) shall apply. Any unreimbursed or uninsured medical expenses shall be divided equally. This definition of "medical" shall be interpreted liberally in accordance with Bucy v. Bucy, 23 Conn. App. 98, 103 (1990).
10. A contingent wage execution shall be entered. If the parties do not sign the necessary documents within thirty days from the effective date of this order, a wage execution will enter immediately for the above payments.
11. Each party shall keep as their separate property, free and clear of the claims of the other, the real estate, personal property and motor vehicles listed in their respective affidavits.
12. The plaintiff shall own free and clear from any claims by the defendant his interest in the condominium in Croton-On-The-Hudson, New York. CT Page 6091
13. The defendant shall own free and clear from any claims by the plaintiff her interest in the real property in Cazenovia, New York.
14. Each party shall hold the other harmless from any and all claims, demands and/or liabilities arising out of said respective real property including utilities, taxes, assessments, liens, and mortgage obligations, if any.
15. The plaintiff is entitled to receive as his own personal property, free and clear of any claims by the defendant, any interest in any pension plan, retirement plan, 401K plan, or any company plan furnished to him by his current employer.
16. The defendant shall pay and hold the plaintiff harmless from any and all loans to the parties from the defendant's family.
17. Each party shall be responsible and hold the other harmless for the debts listed in their respective affidavits.
18. The plaintiff shall pay for and maintain, naming the minor child as the primary beneficiary, for as long as he is obligated to pay child support, the sum of $100,000 life insurance as set forth in his financial affidavit provided by his employer. The plaintiff shall provide proof of compliance with said order upon written request by the defendant to the plaintiff, but no more than twice per calendar year.
19. This judgment was rendered from the bench on February 10, 1998 and is effective February 10, 1998.
20. The defendant shall prepare the judgment file for submission to and approval by the plaintiff.
KEVIN TIERNEY, J.