**Marjorie ROSENTHAL,**
**et al., Plaintiffs**

v.

**FORD MOTOR COMPANY,**
**INC., et al., Defendants.**

**Civil Action No. 3:05CV478 (JCH).**

United States District Court,
D. Connecticut.

Nov. 21, 2006.

Louise M. Roselle, Paul M. DeMarco, Stanley M. Chesley, Troy W. Skeens, Jr., Waite Schneider Bayless & Chesley CO, LLP, Cincinnati, OH, J. Craig Smith, Richard A. Bieder, William M. Bloss, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, for Plaintiffs.

James M. Campbell, Campbell, Campbell, Edwards & Conroy, P.C., Boston, MA, Mark Judson Hoover, Campbell Campbell Edwards & Conroy, East Hartford, CT, David T. Moss, Hanna, Campbell & Powell, LLP, Akron, OH, Marc R. Brosseau, Kerr, Brosseau, O'Brien, LLC, Denver, CO, Matthew Feigenbaum, Cohn, Birnbaum & Shea, Westport, CT, Richard H. Schliem, III., Yockey, Yockey & Schliem, Farmington Hills, MI, Scott G. Edwards, Hartline, Dacus, Barger, Dreyer & Kern, L.L.P., Dallas, TX, Thomas W. Witherington, Cohn, Birnbaum & Shea, Hartford, CT, for Defendants.

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### [Doc. Nos. 102 & 104]

HALL, District Judge.

### I. INTRODUCTION

The plaintiffs, Marjorie Rosenthal, individually and as executrix of the Estate of Amal Murarka, Sumeet Murarka, and Pamela Murarka, have asserted numerous claims against defendants Ford Motor Company ("Ford"), Bridgestone Firestone North American Tire, LLC ("BFNT"), and BFS Retail & Commercial Operations, LLC ("BFRC") d/b/a Firestone Tire and Service Center.[1] The claims arise from a one-car automobile accident that occurred when a Firestone tire tread separated and caused a 1995 Ford Explorer to roll over repeatedly. Amal Murarka and Sumeet Murarka were in the Explorer at the time of this accident, which instantly killed Amal Murarka and seriously injured Sumeet Murarka. The other two plaintiffs, Marjorie Rosenthal and Pamela Murarka, were in the car behind, and witnessed the accident.

The defendants have moved for partial summary judgment on plaintiffs' claims for strict liability, breaches of express and implied warranties, misrepresentation, fraud, violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), and punitive damages, asserting that there is no genuine issue of material fact concerning any of the plaintiffs' claims.

### II. STANDARD OF REVIEW

In a motion for summary judgment, the burden lies on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir.2004). The moving party may satisfy this burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002) (per curiam) (internal quotation marks and citations omitted); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

---

**1.** In this opinion, BFNT and BFRC will be referred to collectively as "Firestone," unless there is a need to discuss each entity separately.

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine, " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523 (internal citation omitted). Thus, " '[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.' " *Id.* (quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991)); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate."). " 'If, as to the

issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.' " *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004) (quoting *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R.Civ.P. 56(e); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. *Id.* "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted). Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993).

## III. FACTUAL BACKGROUND[2]

On April 3, 2001, Paul Rosenthal, a Connecticut resident, gave his 1995 Ford Explorer to his daughter, plaintiff Marjorie Rosenthal, and son-in-law, the decedent, Amal Murarka. *See* Ford's Loc.R.Civ.P.

---

**2.** For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiffs, where there is evidence to support their allegations.

56(a)1 Statement ("Ford's Stat.") at Ex. D, Bill of Sale [Doc. No. 108]. The vehicle had been bought by Mr. Rosenthal in 1998, and the Firestone FR680 steel-belted radial tires that were on the Explorer at the time of the accident had been purchased by Mr. Rosenthal from a Firestone Service Center in Stamford, CT, in 1997. Firestone's Stat. at Ex. J [Doc. No. 106]. The car had initially been leased by Mr. Rosenthal beginning in 1995, who then purchased it in 1998 for his own use. During this entire period, the car was registered in Connecticut. *See* Plf.'s Loc.R.Civ.P. 56(a)2 Statement ("Plf.'s Stat.") at Ex. P. Rosenthal Dep. at 9.[3]

In 2002, plaintiffs Marjorie Rosenthal and Amal Murarka moved from Baltimore, MD, to North Carolina, where they both accepted jobs at the University of North Carolina–Chapel Hill. Firestone's Stat. at Ex. D, M. Rosenthal Dep. at 13, 17. In August 2003, Sumeet Murarka, Amal Murarka's brother, and his wife Pamela, both New York residents, were vacationing in North Carolina. Firestone's Stat. at Ex. A, Am. Compl. at ¶¶ 7. On August 16, 2003, Amal Murarka was driving the Ford Explorer, with his brother Sumeet Murarka as passenger, on I–40 near Benson, North Carolina. Ford's Stat. at Ex. ¶¶ 1–3, 5, Amended Complaint ("Am.Compl."). Marjorie Rosenthal and Pamela Murarka and their children were in the car behind.

The Ford Explorer was involved in a single-car automobile accident. While driving on I–40, the tread on the left rear Firestone tire separated, and the Explorer rolled over repeatedly on the highway. *See* Plf.'s Corrected Memorandum in Opposition to Defendants' Motions for Summary Judgment ("Mem. in Opp.") at 2–3 [Doc. No. 115]; Am. Compl. ¶¶ 27–29. Plaintiffs state that both Amal and Sumeet Murarka were wearing their seatbelts. *See* Plf.'s Mem. in Opp. at 2. Defendants allege that Amal Murarka was contributorily negligent. *See* Firestone's Reply Mem. at 2, Firestone's Answer to Am. Compl. at Third and Fifteenth Affirmative Defenses.

The accident resulted in the immediate death of Amal Murarka and injuries were suffered by Sumeet Murarka, who was initially treated in a hospital in North Carolina. Firestone's Stat. at Ex. A, Am. Compl. at ¶¶ 1, 30, 31. Following the accident, Amal Murarka's estate was opened in North Carolina and Marjorie Rosenthal was appointed executrix. *Id.* at Ex. E. In June 2004, Marjorie Rosenthal moved with her children to Connecticut. *Id.* at Ex. D, M. Rosenthal Dep. at 3. The plaintiffs had initially filed this lawsuit in the Northern District of Ohio. *Id.* at Ex. F, Ohio Complaint.

## IV. DISCUSSION

### A. Choice of Law

■ The defendants argue that North Carolina law governs the products liability

---

**3.** At oral argument, held on October 18, 2006, the parties agreed that Paul Rosenthal was the first consumer-purchaser of the car. Pursuant to a lease agreement, Mr. Rosenthal's employer, Lindemeyr Munroe (a company located in Purchase, New York, near the Connecticut border), obtained the car in 1995 from Auto Rental Corporation, whose headquarters are located in Worcester, MA. *See* Plf.'s Mem. in Opp. at 3, Skeens Aff. at Ex. G. [Doc. No. 112]. Prior to this, the car had initially been purchased for resale by Al Piemonte Ford Sales, Inc. (IL) and then shipped to Harr Motor Company (MA), which delivered it to Auto Rental for leasing. *See* Ford's Stat. at Ex. C, Chen Aff. ¶ 8. According to plaintiffs, Harr Motor Co. is a Ford dealer, *see* Plf.'s Mem. in Opp. at 3, Skeens Aff. at Ex. A, and it and Auto Rental were both owned by Automotive Management Inc. ("AMI"), a wholly-owned subsidiary of Ford Motor Credit Company. *See id.* Thus, plaintiffs characterize the sale to Mr. Rosenthal as the "first sale outside the Ford family." Plf.'s Mem. in Opp. at 4.

claims; plaintiffs argue that Connecticut law applies. Although it is a close question, the court cannot agree with defendants that the substantive law of North Carolina should govern.

■ To decide which state's law applies, "a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir.2002); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). While Connecticut "traditionally adhered to the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury, or *lex loci delicti* ... in certain circumstances in which the traditional doctrine does not apply, the better rule is the analysis contained in the Restatement (Second) of the Conflict of Laws." *Williams v. State Farm Mutual Automobile Insur. Co.*, 229 Conn. 359, 370, 641 A.2d 783 (1994); *see O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986). "Recently, courts applying Connecticut choice-of-law law have used the Restatement approach even where *lex loci* would lead to the same result." *United States Fidelity & Guaranty Co. v. S.B. Phillips Co., Inc.*, 359 F.Supp.2d 189, 206 (D.Conn. 2005). This court will "follow the trend" and apply the "most significant relationship" analysis set forth in Sections 6 and 145 of the Restatement (Second) that the Connecticut Supreme Court adopted in *O'Connor*. *Id.*

The Restatement (Second) provides that: "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles

stated in § 6." Restatement 2d of Conflict of Laws ("Restat.2d"), § 145(1). Section 6 of the Restatement provides that, absent a statutory directive:

> "the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

Restat.2d, § 6(2). The choice of law analysis set forth in §§ 145 and 6 are applied by "weighing ... the relative significance of the various factors that § 6 lists." *O'Connor*, 201 Conn. at 651, 519 A.2d 13.

To assist in the evaluation of these policy choices, the Restatement provides further guidance: "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restat.2d, § 145(2). The relative importance of these contacts is determined with respect to the instant issue. *Id.* In this case, the parties agree that either North Carolina or Connecticut law governs.

Looking at the § 145(2) contacts, the plaintiffs were injured in North Carolina, and thus § 145(2)(a) weighs in favor of

applying North Carolina law.[4] As for § 145(2)(b), the place where the conduct causing the injury occurred, the court finds that this factor weighs in favor of Connecticut. The plaintiffs' product liability claims are based on the allegation that the Ford Explorer and Firestone tire were defective as designed, and that prior to the installation of the tire on the car, defendants already knew or should have known of the possible dangers arising from such a combination. *See* Plf.'s Stat. at Ex. B, H.R. Baumgardner Aff. at §§ 18–19. Even though the car and tire were designed and manufactured in states other than North Carolina and Connecticut, the combination of the allegedly—defective Ford Explorer with the allegedly-defective Firestone tire is alleged to have caused the single-car accident at issue. Plaintiffs' lawsuit is premised not on any acts taken by defendants in North Carolina, but on the transaction—the sale and installation of the tire onto the car—that was focused in Connecticut.

The third contact to consider is the domicile of the parties. *See* § 145(2)(c). The decedent, Amal Murarka, was domiciled in North Carolina at the time of the accident, and so was his wife, Marjorie Rosenthal, and their children. *See* Firestone's Stat. at Ex. D, M. Rosenthal Dep. at 4 [Doc. No. 106]. However, Marjorie Rosenthal has since moved to Connecticut with her children,[5] and thus currently none of the parties resides in North Carolina. Plaintiffs Sumeet and Pamela Murarka were and are New York residents who were temporarily visiting North Carolina at the time of the accident. *See id.* at Ex. A, Complaint at ¶ 7. Defendant Ford Motor Company is a Delaware corporation with a principal place of business in Michigan. *Id.* at Ex. B, Ford Answer at ¶ 19. BFNT is a Delaware limited liability company with a principal place of business in Tennessee. *See id.* at Ex. C, Firestone Answer at ¶ 15. BFRC is also a Delaware limited liability company with a principal place of business in Illinois. It has a business in Stamford, CT, as Firestone Tire and Service Center. *Id.* at Ex. C, Firestone Answer at ¶ 10. When the parties are not "grouped in a single state," as here, the fact that "one of the parties is domiciled or does business in a given state will usually carry little weight of itself." Restat.2d, § 145 at cmt. e. Thus, § 145(2)(b) does not aid the court's choice-of-law inquiry.

As for § 145(2)(d), "[w]hen there is a relationship between the plaintiff and the defendant and when the injury was caused by an act done in the course of the relationship, the place where the relationship is centered is another contact to be considered." Restat.2d, § 145 at cmt. e. The defendants argue that any relationship that existed between the parties must have centered in North Carolina, where Amal Murarka and Marjorie Rosenthal lived and used the car. The plaintiffs counter that the allegedly defective car and tire were not designed or manufactured in North Carolina. Moreover, the tire was purchased and installed on the

---

4. *See also* Restat.2d, §§ 146 and 175, which provide that in actions for personal injury or wrongful death, "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."

5. The court finds that it is irrelevant to this analysis that plaintiff Marjorie Rosenthal moved to Connecticut after the accident. Because her parents lived there, the court cannot conclude that she moved to Connecticut expressly to bring this lawsuit or claim the application of Connecticut law.

vehicle in Connecticut. Mr. Paul Rosenthal was also the first consumer-purchaser of the car, which was registered and maintained in Connecticut until he gave it to his daughter and son-in-law in 2001.[6] According to the plaintiffs, the sale and installation of the tire onto the car is the "event without which this tragedy could have been avoided—the deadly combination of the defective Firestone tire and defective Ford Explorer, which unquestionably came into existence in Connecticut, at a tire center that is still located here." Plf.'s Mem. in Opp. at 7. This court agrees with another Connecticut district court, which found in a case involving a defective tire that factor (d) was "inconclusive [where] there was no 'relationship' between the parties other than the purchase and installation of the tire," *Pollack v. Bridgestone/Firestone, Inc.*, 939 F.Supp. 151, 153 (D.Conn.1996).

At first blush, North Carolina—as place of injury, place of residence of two of the plaintiffs at the time of the accident, place of the car's registration at the time of the accident, and place where plaintiffs initially went to seek medical treatment, *see* Plf.'s Firestone Stat. at ¶¶ 15, 20–21, M. Rosenthal Dep. at 8–9, 71–73—seems to have the most significant relationship to the occurrence and the parties. However, upon carefully evaluating the relative importance of each factor, the court concludes

that Connecticut in fact has the greatest interest.

To reach this conclusion, the court adheres to *O'Connor's* direction that it is the significance, not the number, of § 145(2) contacts that governs the choice of law inquiry. 201 Conn. at 652–53, 519 A.2d 13. To determine this significance, the court must apply the relevant § 6 guidelines to the facts of the present case. The contacts must be "evaluated according to their relative importance with respect to the particular issue," Restat.2d, § 145(2). Not all of the § 6 factors will be equally important in every case. Indeed, comment b to § 145(1) states that the choices of policy emphasized in § 6(d), (e), and (f) are "of lesser importance in the field of torts."[7] Restat.2d, § 145 at cmt. b. Because of the "relative insignificance" of (d), (e), and (f), the four remaining factors that are listed in § 6 "assume greater importance." *Id.* However, factor (g), ease in determination and application of the law to be applied, "should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results." Restat.2d, § 6 at cmt. j. Thus, this court will look especially at factors (a), (b), and (c) in its choice-of-law analysis.[8]

In this case, the particular issue "whose disparate resolution by two relevant jurisdictions gives rise to the conflict of laws" involves plaintiffs' theory of strict liability.[9]

---

**6.** The plaintiffs emphasize that both purchases were done in Connecticut by a Connecticut resident, Paul Rosenthal, who first used the car for himself for three years before gifting it to his daughter and son-in law in 2001. *See* Plf.'s Mem. in Opp. at 4, P. Rosenthal Dep. at 10. However, since Paul Rosenthal is not a party to this action, his residency is not relevant to the choice-of-law analysis.

**7.** These factors provide: "(d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, [and] (f)

certainty, predictability and uniformity of result." Restat.2d, § 6.

**8.** These factors provide: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, [and] (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." Restat.2d, § 6.

**9.** Plaintiffs also assert other theories that form the basis of this summary judgment motion, such as breach of warranty, misrepre-

*O'Connor,* 201 Conn. at 653, 519 A.2d 13. North Carolina's Product Liability Act does not adopt the doctrine of strict liability. *See* N.C.Gen.Stat.Ann. § 99B–1.1 ("There shall be no strict liability in tort in product liability actions."); *see also Driver v. Burlington Aviation, Inc.,* 110 N.C.App. 519, 430 S.E.2d 476, 482 (1993). Connecticut's Product Liability Act ("CPLA") creates a consolidated cause of action for all product liability claims, which "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." Conn.Gen.Stat.Ann. § 52–572n(a).

■ While creating the "exclusive remedy for claims falling within its scope," *Winslow v. Lewis–Shepard, Inc.,* 212 Conn. 462, 471, 562 A.2d 517 (1989), the CPLA was "not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail." *LaMontagne v. E.I. Du Pont De Nemours & Co., Inc.,* 41 F.3d 846, 855 (2d Cir.1994) (*LaMontagne II* ). Thus, it does not preempt all common law theories of product liability; rather, "the CPLA bars separate common law *causes of action* in product liability cases." *Densberger v. United Technologies Corp.,* 297 F.3d 66, 70 (2d Cir.2002). As such, it "retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability claim." *Lamontagne v. E.I. Du Pont de Nemours & Co., Inc.,* 834 F.Supp. 576, 587 (D.Conn.1993) (*LaMontagne I* ).

Considering that North Carolina does not recognize strict liability for product liability claims while Connecticut has retained it as a theory for recovery, the court must "analyze the respective policies and interests of [North Carolina], the place of injury, and Connecticut, the forum state." *O'Connor,* 201 Conn. at 653, 519 A.2d 13. The first relevant Restatement § 6 factor, the "needs of the interstate and international systems," seeks to harmonize relations between states and "to facilitate commercial intercourse between them." Restat.2d, § 6(a) & cmt. d. In the instant case, this factor does not offer much guidance, as it is "doubtful that this court's choice of law decision will have any bearing on this goal." *Krstich v. United Services Auto. Ass'n,* 776 F.Supp. 1225, 1232 (N.D.Ohio 1991); *see also O'Connor,* 201 Conn. at 651, 519 A.2d 13 (where there was a single car accident in Quebec involving two Connecticut domiciliaries, the court stated that "[w]e are not today concerned with a case that offends systemic policy concerns of another state or country").

As for the relevant policies of the forum state and other interested states, factors (b) and (c) of § 6, North Carolina, as the place of injury, has an interest in applying its standards to the present case. However, according to comment e to Restatement (Second) § 145, the place of injury will not always play an important role in the choice-of-law analysis: "for example, when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue." Restat.2d, § 145 at cmt. e. Some courts that apply the Restatement balancing test have expressly found that the place of injury is not important in product liability cases, where the injury could have occurred anywhere. *See Rowe v. Hoffmann–La Roche Inc.,* 383 N.J.Super. 442, 456, 892 A.2d 694 (N.J.Su-

---

sentation, fraud, and punitive damages. However, the key difference for purposes of the choice-of-law analysis is found in each state's treatment of strict liability claims. As for plaintiff's CUTPA claim, that is obviously premised on Connecticut law.

per.Ct.App.Div.2006) ("[A]lthough place of injury is a significant factor in many tort actions, it does not warrant undue weight in product liability cases."); *see also Barton v. The Hertz Corp.*, 35 F.Supp.2d 1377, 1380 (M.D.Fla.1999) ("The place of the injury takes place [sic] *only* when a comparison of the competing state's contacts reveals that it is the state most significantly connected to the particular issue in the litigation."). Here, too, the tread separation could have happened in any state, thereby diminishing the importance of North Carolina as the place of injury.

Moreover, though not recognizing strict liability, North Carolina's product liability law "expresses no interest in regulating the conduct of the defendant, but rather limits the liability exposure to which his conduct subjects him." *O'Connor*, 201 Conn. at 654, 519 A.2d 13. As comment e to Restatement § 146 (relating to personal injury) advises, an important factor in the "most significant relationship" analysis is to look at the purpose sought by the particular tort rule:

> [I]f the relevant local rule of the state where the injury occurred would impose absolute liability upon the defendant, it is probable that this state is seeking by means of this rule to insure compensation for the injured person.... If, on the other hand, the defendant would enjoy a *special immunity* for his conduct under the local law of the state of injury, it is not clear that the interests of this state would be furthered by application of its rule.

Restat.2d, § 146 at cmt. e (emphasis added). Although North Carolina's rejection of strict liability does not actually create a "special immunity," it does theoretically serve as an immunity by protecting defendants against product liability claims based on strict liability. Thus, because North Carolina has chosen not to adopt the doctrine of strict liability, none of its policies or interests would be frustrated by applying Connecticut law, especially when none of the defendants who might be subject to strict liability is a North Carolina domiciliary.

Connecticut, as the place where the combination of car and tire was sold, has a strong interest in vindicating rights it created in connection with this transaction. In *Nationwide Mutual Fire Ins. Co. v. Gen. Motors Corp.*, 415 F.Supp.2d 769, 775 (N.D.Ohio 2006), the court applied the Restatement (Second) balancing test to a products liability claim that involved a fire in an RV that destroyed the car. The court decided that Florida, as the place of sale, had an interest "far superior" than that of Connecticut, the place where the fire in the RV occurred. As the court explained, "[i]n product liability claims, the primary interest of a state is to deter the sale and/or manufacture of negligently or defectively manufactured goods to that state's citizens." *Id.* Here, while the injury, the single-car automobile accident, could have occurred "anywhere in the world," *Rowe v. Hoffmann–La Roche Inc.*, 383 N.J.Super. 442, 456, 892 A.2d 694 (N.J.Super.Ct.App.Div.2006), the particular products at issue in this products liability action, the combination of the Ford Explorer and the Firestone tire, were first sold to a consumer in Connecticut and installed there. Thus, "[b]ecause the central event upon which a products liability claim is normally based is the sale of the goods, injured parties would expect that the law of the place of sale should govern with respect to injuries caused by those defects." *Nationwide Mutual Fire Ins. Co.*, 415 F.Supp.2d at 775.

Moreover, Connecticut, under the Products Liability Act, has a clear policy of holding manufacturers and sellers of defective products accountable for injuries

caused by such products. *See Salóomey v. Jeppesen & Co.*, 707 F.2d 671, 675 (2d Cir.1983) ("Connecticut, through its legislature and courts, has indicated strong interest in fully compensating its domiciliaries when they file meritorious wrongful death and strict products liability actions."). Such a policy would not be served by applying North Carolina law, which does not recognize actions in strict products liability. *See id.* Indeed, North Carolina has no interest in having its limitations enforced by a Connecticut court to protect defendants, who are not North Carolina corporations, against plaintiffs, who are currently all non-North Carolina residents, seeking recovery for their injuries. In fact, Connecticut's interest in "deter[ring] the sale and/or manufacture of negligently or defectively manufactured goods" would be frustrated by application of North Carolina law. *Nationwide Mutual Fire Ins. Co.*, 415 F.Supp.2d at 775.

The defendants rely on *Denman v. Snapper Division*, 131 F.3d 546 (5th Cir. 1998), as controlling the analysis here. The facts of that case are similar to the present action: a lawnmower was sold in Mississippi by a Mississippi defendant to a Mississippi resident, who then loaned it to his son, a North Carolina resident. The grandson, also a North Carolina resident, was injured while using the lawnmower in North Carolina and brought a products liability action in Mississippi. *Id.* at 547–48. The Fifth Circuit refused to apply Mississippi's statute of repose, finding that the place of sale provided an "insignificant basis" for applying Mississippi law, as the fact that "the mower entered the stream of commerce in Mississippi does not tip the balance in favor of applying Mississippi law." *Id.* at 550.

*Denman* is not controlling, and the court disagrees with its reasoning. In addition, the court finds *Denman* to be distinguish-

able by the fact that both North Carolina and Mississippi had statutes of limitations; thus, each state had affirmatively spoken on the issue. On the contrary, here North Carolina does not have a different strict liability standard than Connecticut; instead, it does not recognize strict liability for products liability claims. Although North Carolina is not silent on this, neither the allegedly defective products in this case nor any of the defendants have any connection with North Carolina. Thus, the policy behind North Carolina's no-strict liability rule "would not be substantially furthered by application of [North Carolina] law in the circumstances of the present case." *O'Connor*, 201 Conn. at 655, 519 A.2d 13. Connecticut's policies, on the other hand, would be frustrated by applying North Carolina's law. *See De Fourneaux v. Sturm, Ruger & Co.*, 503 F.Supp. 2, 4 (D.Conn.1980) (allowing application of Missouri's one-year statute of limitations on wrongful death action as opposed to Connecticut's two-year statute of limitations, because a Missouri cause of action exists to redress wrongs resulting in death, and "Connecticut has an interest only in seeing that the opportunity for redress exists—its absence would, of course, offend Connecticut's public policy and Connecticut might refuse to apply such a law"); *see also O'Connor*, 201 Conn. at 654, 519 A.2d 13 (refusing to apply Quebec no-fault rule because it "eschews investigation into the possible negligence of the defendant's conduct and limits the amount of damages the victim of the defendant's conduct may recover"). The allegedly defective combination of the Ford Explorer and the Firestone tire originated in Connecticut when the car was first sold to a consumer and the tire was then installed. Thus, "Connecticut's contacts with the litigation give it a legitimate interest in applying its law to the controversy." *Id.* at 656, 519 A.2d 13.

In finding Connecticut to have the "most significant relationship," the court concludes that Connecticut law must be applied to the products liability claims in the instant motion.

### B. Strict Liability

█ In their Memoranda in Support of Summary Judgment, defendants Ford and Firestone argued only that the plaintiffs' strict liability claims are not recognized under North Carolina law. In Firestone's Reply, it argued that summary judgment must also be granted under Connecticut law. *See* Firestone Reply at 13. At oral argument, Ford conceded that it is not moving for summary judgment under Connecticut law.[10]

The CPLA recognizes an action grounded in strict liability for a product defect.[11] *See* Conn.Gen.Stat. § 52–572n. Connecticut courts have adopted the strict liability test established at § 402A of the Restatement (Second) of Torts. *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 214, 694 A.2d 1319 (1997). Section 402A imposes liability only when the product is unreasonably dangerous to "the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* at 211, 694 A.2d

1319 (quoting 2 Restatement (Second) Torts § 402A, comment (i)). "Under this formulation, known as the 'consumer expectation' test, a manufacturer is strictly liable for any condition not contemplated by the ultimate consumer that will be unreasonably dangerous to the consumer." *Id.* at 212, 694 A.2d 1319.

Firestone asserts, both in its Reply and at oral argument, that plaintiffs' designated tire expert, H.R. Baumgardner, stated in an affidavit that, "I have testified that the subject FR 680 tire is not defectively designed or manufactured." *See* Plf.'s Mem. in Opp. at Skeens Aff. at Ex. B. Plaintiffs responded at oral argument that their experts indicated that Firestone used a rubber compound, known as J2757, in its tires. *See id.* at Skeens Aff. at Ex. D, Queiser Dep. at 12. That compound affixes the steel belts together, but certain tires that were made with that compound were subject to recall by Firestone in 2000. *See id.* at Ex. D, Queiser Dep. at 17. According to Mr. Baumgardner:

> The FR680 uses the same defective J2757 steel belt skim rubber used in the ... [Firestone] tires that were the subject of a massive recall in 2000. The recall was caused due to failures in this

---

**10.** Also at oral argument, the plaintiffs clarified that their strict liability theory was based on defective design only, and not on defective manufacturing or inadequate warnings.

**11.** The CPLA, while creating a single cause of action for product liability claims, did not abolish common law theories of liability. The CPLA defines a product liability claim as including, but not limited to, "all actions based on the following theories: strict liability in tort; negligence; breach of warranty, express of implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." Conn. Gen.Stat. § 52–572m(b). "This definition incorporates the common law theories of liability; it does not abolish them." Robert B.

Adelman & Mary Ann Connors, The *Legal Framework of a Products Liability Case in Connecticut*, 67 Conn. B.J. 355, 359 (1993). Thus, while separately pleading the common law theories of liability, the plaintiffs have brought one products liability claim under the statute. *See LaMontagne II*, 41 F.3d at 855 (stating that "[a]lthough the CPLA introduced simplified pleading, ... it apparently was not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail"). In analyzing plaintiffs' claims, then, the court must "look first [to] the CPLA and—where that statute is silent—[it must] look to Connecticut common law for guidance." *Lamontagne I*, 834 F.Supp. at 588.

very thin, but critical layer of rubber. It is this same steel belt skim rubber that failed in the subject FR680 tire causing the tread peel. It also caused over 250 non-recalled Firestone tire failures of other sizes and designs I have examined that [had] been built with this rubber compound since 1992.

I have testified that the subject FR680 tire is not defectively designed or manufactured. Its defect is in the specification of the J2757 steel belt skim rubber, one of the several rubber compounds used in many, if not most, of the Firestone passenger tires made from 1992 through and beyond the production date of the subject tire.

*See id.* at Ex. B. H.R. Baumgardner Aff. at ¶¶ 14–15. Thus, although the tire itself may not be defectively designed, Mr. Baumgardner testified that, "[t]he recipe for this rubber is defective and the subject tire suffered a tread separation because the thin layer of J2757 rubber between the belts failed." *Id.* at ¶ 16.

As defendant Firestone has not pointed the court to any evidence that would counter plaintiffs' defective design theory, other than the single statement of plaintiffs' tire expert taken out of context, the court finds that the plaintiffs have created a question of fact on whether the elements of a strict liability claim exist. Thus, it denies Firestone's motion for summary judgment on this issue.

### C. Fraud and Misrepresentation

At oral argument, plaintiffs conceded that they are not pursuing their fraud or misrepresentation claims against defendants Firestone or Ford. Thus, the court rules that these claims are withdrawn with prejudice.

### D. Breach of Warranty

■ At oral argument, plaintiffs conceded that they are not pursuing their breach of express warranty claim, but that they are pursuing their breach of implied warranty claims against Firestone and Ford. The parties subsequently submitted memoranda addressing the breach of implied warranty claims. The sole issue of contention is whether the CPLA has retained some form of privity requirement so as to bar these claims. Plaintiffs argue that no privity is required, permitting such claims to be brought by both Amal and Sumeet Murarka. Defendants contend that these claims, while brought under the CPLA, should be analyzed pursuant to the requirements of the Uniform Commercial Code ("UCC"), which requires a relaxed form of privity that would bar the plaintiffs from bringing these claims in this case.

The CPLA abolishes the privity requirement for all actions brought under the Act. Section 52–572n(b) provides that, "[a] claim may be asserted successfully under said sections notwithstanding the claimant did not buy the product from or enter into any contractual relationship with the product seller." Conn.Gen.Stat. § 52–572n(b); *see also Utica Mut. Ins. Co. v. Denwat Corp.,* 778 F.Supp. 592, 595 n. 2 ("It is significant to note that § 52–572n(b) specifically eliminates the privity requirement in actions brought pursuant to the statutory provisions governing product liability actions. Section 52–572n(c) directs that recovery for economic loss from harm caused by a product be pursued under the UCC, however section 52–572n(b) does not address the privity requirement in actions to recover such loss."). Thus, as expressly provided in the CPLA, plaintiffs may assert a breach of warranty claim without a privity relationship.

Even without this express provision, there no longer seems to be a privity

requirement under a common law warranty claim sounding in tort. In Connecticut, there appear to be two bases for liability under the implied warranty theory, contractual and tort. Wright, FitzGerald & Ankerman, *Conn. Law of Torts*, § 81, at 222 (3d ed.1991). While the concept of warranty based on contract law is found in the UCC,[12] "the recent development of the law of products liability has re-established the common-law action of breach of warranty sounding in tort rather than in contract." *Id.*

> The elements required for common law tortious implied warranty actions are similar to those of statutory or contractual implied warranty actions. The major differences, however, are that common law implied warranty abolishes the requirement of notice, privity and a sale. Where a warranty exists, it applies not only to users and consumers, but also to bystanders.

Adelman & Connors, 67 Conn. B.J. at 367.

The Connecticut Supreme Court first acknowledged this development in *Hamon v. Digliani*, 148 Conn. 710, 716, 174 A.2d 294 (1961), explaining that "[t]he recognition of such a right of action rested on the public policy of protecting an innocent buyer from harm rather than on the ensuring of any contractual rights." In *Hamon*, the plaintiff was a purchaser as well as a user of a household detergent, who sued the retail storekeeper and the manufacturer of the product for injuries she sustained. *Id.* at 711, 174 A.2d 294. The Court found that lack of privity was not a bar to a lawsuit against the manufacturer by a plaintiff who bought a product in a sealed container and who relied on representations made by the manufacturer in its advertisements or labels and later suffered injuries because the product failed to conform to the representations. *Id.* at 718, 174 A.2d 294.

A few years later, the Connecticut Supreme Court held that, "[w]here the liability is fundamentally founded on tort rather than contract there appears no sound reason why the manufacturer should escape liability simply because the injured user, a party in the normal chain of distribution, was not in contractual privity with it by purchase and sale." *Garthwait v. Burgio*, 153 Conn. 284, 289, 216 A.2d 189 (1965). The Supreme Court in *Garthwait* adopted § 402A of the Restatement (Second) of Torts, entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer." Comment 1 to this section points out that, "the liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant." Thus, the comment explains, "[i]t is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere *donee* from the purchaser." *Id.* at cmt. 1 (emphasis added). Although this section generally refers to strict liability in tort, comment m states that, "[t]here is

---

**12.** The privity requirement of the UCC provides:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of warranty. This section is neutral with respect

to case law or statutory law extending warranties for personal injuries to other persons. A seller may not exclude or limit the operation of this section.

Conn.Gen.Stat. § 42a–2–318. By contrast, "[v]ertical privity was rather quickly eliminated in common law implied warranty actions following *Hamon v. Digliani*." Adelman & Connors, 67 Conn. B.J. at 371.

nothing in this Section which would prevent any court from treating the rule stated as a matter of 'warranty' to the user or consumer." *Id.* at cmt. m. However, if this is done, courts should recognize that " 'warranty' must be given a new and different meaning if it is used in connection with this Section. [Thus, i]t is much simpler to regard the liability here stated as merely one of strict liability in tort." *Id.* The Connecticut Supreme Court's discussion of this Section of the Restatement in the context of a breach of warranty claim underscores that Court's understanding of the differences between contractual and tortious warranty claims, and the absence of a privity requirement in the latter.[13]

Because of the express statutory provision under the CPLA and the developments under the common law, the court finds that the defendants are not entitled to summary judgment on breach of implied warranty.

## E. CUTPA

■ Conn. Gen.Stat. § 42–110b(a) provides that, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). To determine whether a practice violates CUTPA, courts examine these factors: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Sanghavi v. Paul Revere Life Ins. Co.*, 214 Conn. 303, 311–312, 572 A.2d 307 (Conn.1990) (citations omitted). "[T]o be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an 'ascertainable loss' due to a CUTPA violation." *Collins v. Anthem Health Plans, Inc.*, 275 Conn. 309, 334–335, 880 A.2d 106 (2005). " 'Ascertainable' means capable of being discovered, observed or established," and " '[l]oss' has been held synonymous with deprivation, detriment, and injury." *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 613, 440 A.2d 810 (1981).

■ The basis for plaintiffs' CUTPA claims, brought on behalf of Marjorie Rosenthal individually and as Executrix,[14] is the loss in value of the Ford Explorer that included the tire at the time of the accident. Plaintiffs claim that, by failing to disclose the alleged defective nature of the Ford Explorer and Firestone tire, the ac-

---

**13.** The defendants' reliance on *Resnick v. Sikorsky Aircraft*, 660 F.Supp. 415 (D.Conn. 1987), is misplaced. Pursuant to a choice-of-law analysis, the court in that case applied North Carolina law to the tort claims and Connecticut law to the contract claim. The tortious breach of warranty claim was then dismissed because it was not recognized in North Carolina, and the court was left with analyzing the contractual warranty claim under Connecticut law. It is in this context that the court held that, "privity would not be required where a plaintiff would be left without a remedy either in tort or contract," nevertheless dismissing plaintiffs' breach of con-

tractual warranty claims in part because the plaintiffs still had causes of action in negligence. *Id.* at 418. In this case, plaintiffs' breach of warranty claims appear to be founded in tort, thereby making the *Resnick* analysis inapposite.

**14.** At oral argument, plaintiffs admitted that it was error to assert their CUTPA claims on behalf of Sumeet Murarka. Thus, the only CUTPA claims that remain are those brought on behalf of Marjorie Rosenthal, in her individual capacity and as Executrix.

tual value of the car with tire was less than what they had valued it without knowledge of any deficiencies. Defendants assert that the CUTPA claims are barred by the statute of limitations and, in the alternative, that plaintiffs have not suffered an "ascertainable loss" as required under the statute. Plaintiffs respond by stating that Marjorie Rosenthal, individually and as Executrix, sustained "ascertainable loss" because the car was completely destroyed. Additionally, plaintiffs respond by asserting that, because defendants fraudulently concealed plaintiffs' cause of action, their CUTPA claims are not time barred.

Turning first to the "ascertainable loss" requirement, defendants argue that the plaintiffs' CUTPA claims fail because the Murarkas neither purchased nor in any other way bargained for the car. The plaintiffs do not directly address this argument; their claim is that the destruction of the entire vehicle suffices to show "ascertainable loss."

In *Hinchliffe*, 184 Conn. at 613, 440 A.2d 810, the Connecticut Supreme Court discussed the "ascertainable loss" requirement under CUTPA, holding that a plaintiff is not required to prove actual damages in order to pursue a CUTPA claim. As the Court explained: "To satisfy the 'ascertainable loss' requirement, a plaintiff need prove only that he has purchased an item partially as a result of an unfair or deceptive practice or act and that the item is different from that for which he bargained." *Id.* at 614–15, 440 A.2d 810. The defendants rely on this language, indicating the requirement of some kind of consumer-type relationship or bargain, to defeat plaintiffs' CUTPA claims.

However, in *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 496, 656 A.2d 1009 (1995), the Connecticut Supreme Court clarified that, "CUTPA imposes no requirement of a consumer relationship." The Court stated that, in addition to claims involving consumer injury, "a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." *Id.* (citations omitted). The Court based its interpretation of CUTPA on the statute's language, its legislative history, and the legislative policy it was intended to implement. As the Court documented, the legislative history showed that supporters of the bill believed that it "gives honest businessmen great protection [against] deceptive or unscrupulous [businessmen] who by unfair methods of competition and deceptive advertising, etc. unlawfully divert trade away from law abiding businessmen." *Id.* at 497, 656 A.2d 1009 (citing Representative Howard A. Newman, 16 H.R.Proc., Pt. 14, 1973 Sess., p. 7323).

Furthermore, the legislature's policy for interpreting CUTPA is found in § 42–110b(b), which states that courts construing the scope of CUTPA "shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))." Conn. Gen.Stat. § 42–110b(b). Thus, Connecticut has adopted the Commission's "Cigarette Rule" to determine whether a practice is unfair under CUTPA, whose third criterion focuses on substantial injury to consumers and has been interpreted by courts to be equally applicable to substantial injury by businessmen or competitors.[15] *See McLaughlin Ford, Inc. v. Ford*

---

**15.** The factors to be weighed under the Cigarette Rule are: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other estab-

*Motor Co.*, 192 Conn. 558, 567–68, 473 A.2d 1185 (1984).

■ The case law and legislative history thus show that CUTPA claims need not be limited to consumer relationships. Nevertheless, this court finds that the plaintiffs are "not within the class of persons that CUTPA intended to protect." *Gersich v. Enterprise Rent A Car*, 1995 WL 904917, at *5 (D.Conn.1995). Although the parties have not pointed the court to any cases involving CUTPA claims by third parties that arise from a defective product received as a gift from a consumer, the legislative history cited in *Larsen* indicates that, while the class of persons that CUTPA was intended to protect is broader than consumers only, this broader class is described only in business terms. *See* 232 Conn. at 497–98, 656 A.2d 1009. Moreover, the third prong of the Cigarette Rule requires a substantial injury to consumers, competitors, or *other business persons*. Here, plaintiffs are neither consumers, nor competitors, nor business persons. Thus, like the reasoning of the court in *Gersich*, which found that plaintiffs, "by virtue of being in a motor vehicle accident with a customer of Enterprise, are not consumers or competitors of Enterprise or other business persons affected by Enterprise's conduct," *id.*, the plaintiffs' CUTPA claims in this case must also fail.

Because the court finds that the CUTPA plaintiffs are not within the class of persons that CUTPA intended to protect, it need not address their fraudulent concealment argument.

### F. Punitive Damages

■ In its Memorandum in Support of Summary Judgment, Ford moved to dismiss plaintiffs' claims for punitive damages on the basis that, "[t]he only evidence the plaintiffs have produced thus far are the vague and general allegations contained in their Amended Complaint." *See* Ford's Mem. in Supp. at F. However, plaintiffs' Memorandum in Opposition cited four sources that support their punitive damages claims, including the opinion of David Renfroe, a vehicle stability expert whose statements are directly addressed to Ford. At oral argument, Ford stated that responding to Renfroe would be better served at the time of trial, thereby conceding that this is not an issue for summary judgment. Thus, the court need only address Firestone's arguments for summary judgment as to plaintiffs' claims for punitive damages in connection with their products liability claim.

Under Connecticut law, punitive damages may be awarded in products liability actions, "if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product." Conn. Gen.Stat. § 52–240b.

Plaintiffs have presented evidence that would support their claim for punitive damages: the testimony, opinions, and findings of three Firestone tire experts and one vehicle stability expert. This evidence indicates that by May 2001, two years before the fatal accident that is at issue in this case, the compound that Firestone used in the tires that were subject to recall was still being used in other tires, including the FR680. *See* Plf.'s Mem. in Supp. at 18, Skeens Aff. at Ex. B. Moreover, plaintiffs' tire expert provided evidence that both defendants may have been aware of the potentially dangerous combi-

---

lished concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." *Fabri v. United Technologies Intern., Inc.*, 387 F.3d 109, 120 (2d Cir.2004).

nation of Firestone tires on Ford Explorers prior to the accident, stating that "Ford reported, and the National Highway Traffic Safety Administration confirmed, that while the Goodyear [Wrangler] tires [on Ford Explorers] suffered only two (2) tread peels causing accidents, there were one thousand one hundred-eighty three (1183) accidents reported from Firestone equipped Explorers." *Id.* at Ex. B, H.R. Baumgardner Aff. at ¶ 19.

Firestone responds that the fact that, as plaintiffs have admitted, only four property damage claims had been filed with respect to the FR680 tires, and that plaintiffs' accident was the only one involving bodily injury, is insufficient to put them on notice of a potential defect with the tire. *See* Firestone's Mem. in Supp. at 17, Queiser Aff. at ¶ 20; Plf.'s Stat. at ¶ 39. Thus, they argue that the plaintiffs cannot show that Firestone knew there was a problem with the specific tire that was on the Ford Explorer in this case. Firestone further questions the accuracy or admissibility of plaintiffs' experts' testimony. *See* Firestone's Mem. in Supp. at 19. However, the court need not decide whether four incidents are sufficient to have placed Firestone on notice or whether the continued use of the potentially dangerous rubber compound rises to the level of willful or wanton behavior. Since it is possible to interpret it as such when the evidence is viewed in the light most favorable to the plaintiffs, the court finds that the plaintiffs' claim for punitive damages presents a genuine issue for trial.

## V. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment [**Doc. Nos. 102 & 104**] are DENIED as to the strict liability, breach of implied warranty, and punitive damages claims.[16] Defendants' motions for summary judgment are GRANTED as to the CUTPA claims. The fraud and misrepresentation claims are dismissed with prejudice.

**SO ORDERED.**

---

**16.** The court rejects defendant Firestone's back-door attempt to move for summary judgment with respect to plaintiffs' claims of *negligence* because of defective manufacturing or inadequate warnings. *See* Firestone's Suppl Mem. at 8–9 [Doc. No. 132]. Firestone did not move for summary judgment on plaintiffs' negligence claims, as its Motion for Summary Judgment stated that it sought summary judgment only on plaintiffs' claims for strict liability, misrepresentation, fraud, breach of express and implied warranties, CUTPA, and punitive damages. *See* Firestone's Motion for Summary Judgment at 2 [Doc. No. 104]. Firestone's Memorandum in Support of Summary Judgment did briefly address plaintiffs' claims of defective manufacturing and inadequate warnings, *see* Mem. in Supp. at 17; however, the court reads that portion of the Memorandum as constituting part of Firestone's argument on plaintiffs' strict liability claims, considering that Firestone had not moved for summary judgment on plaintiffs' negligence claims. Firestone also misrepresents plaintiffs' acknowledgment at oral argument that they would not pursue any claims for defective manufacturing or inadequate warnings, as that acknowledgment was made with respect to plaintiffs' strict liability claims—that is, plaintiffs clarified at oral argument that their *strict liability* theory was based on defective design only, and not on defective manufacturing or inadequate warnings. *See* Firestone's Suppl. Mem. at Ex. A; Oral Argument Transcript at 52.